The **CHASE MANHATTAN BANK, National Association, as Trustee,** Plaintiff,

v.

**EQUIBANK, a national banking association, et al., Defendants.**

Civ. A. No. 74-477.

United States District Court, W. D. Pennsylvania.

May 2, 1975.

Stephen A. George, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for plaintiff; Adlai S. Hardin, Jr., Milbank, Tweed, Hadley & McCloy, New York City, of counsel.

Jerome M. Libenson, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Sanford M. Lampl, Pittsburgh, Pa., for defendants.

## MEMORANDUM AND ORDER

SNYDER, District Judge.

This is a diversity contract action brought by Chase Manhattan Bank (Chase) to recover $108,000 allegedly due on a Letter of Credit issued by Equibank for the account of Air-North Associates (Associates), the general partner of Pitt-Bethel Associates, Inc. (Pitt-Bethel). Equibank denies a proper demand within the credit period, and Associates counterclaims for money said to be on deposit with Chase. Presently before the Court are Motions for Summary Judgment filed by all the parties on the Principal Claim and the Counterclaim. The Court, at this time, can grant Summary Judgment in favor of the Defendants, Associates and Pitt-Bethel on the Plaintiff's Claim and also on their Counterclaim.

## BACKGROUND

Early in 1970, Pitt-Bethel succeeded to by Associates,[1] engaged James W. Rouse and Company (Rouse) to obtain financing for a Sheraton Motor Inn to be constructed near the Greater Pittsburgh International Airport. Rouse contacted Chase and obtained a commitment for financing in the amount of $3,600,000, to be secured by a first mortgage; Pitt-Bethel was to obtain construction financing based upon Chase's commitment to provide the permanent financing. Chase's obligation was contingent on the completion of the project.

Under Paragraph D of the Chase Commitment,[2] Pitt-Bethel procured an

---

1. Air-North Associates is a limited partnership and is the general partner of Pitt-Bethel Associates, Inc. It subsequently assumed Pitt-Bethel's rights and obligations under the loan commitment agreement.

2. Paragraph D of the original commitment letter required the borrower to deposit $108,000 with Chase to be retained as liquidated damages in the event the loan was not closed in accordance with the commitment for any reason other than the bank's default. At the borrower's request, Chase later

agreed to accept the Letter of Credit we are here concerned with. As modified, Paragraph D reads as follows:

"In consideration of the Bank keeping available funds necessary for the making of the loan and in consideration of the time and attention heretofore and hereafter to be given to the transaction and considering that various damages will be suffered, including loss of other suitable opportunities for investment, should the loan fail to close and that the damages of the Bank are not readily susceptible of ascertainment, you shall deliv-

irrevocable Letter of Credit from Equibank in the sum of $108,000, dated April 5, 1971, in effect to guarantee to Chase the completion of the project and the takedown of the permanent financing. Equibank was to pay "by your drafts drawn at sight on us and accompanied by documents specified below", i. e., "certification from you that Air-North Associates have defaulted and which default has not been cured, under the terms of the commitment issued by you dated July 30, 1970."

Thereafter, construction was begun but delays were encountered so that the original deadline for completion of October, 1972, could not be met. By letter of December 27, 1972, Chase agreed to extend the deadline for closing to February 22, 1973,[3] but required and received an extension on Equibank's Letter of Credit to March 30, 1973. Subsequently, a further extension was granted to Associates to close the Chase Loan from February 22, 1973 to March 31, 1973, and the Letter of Credit was extended to April 30, 1973. This last extension will be commented on more particularly herein with respect to the grant of the extension by use of telex.

During the middle of March, Equibank's Real Estate Counsel forwarded various closing documents for Chase's approval and as the time for closing drew near, Robert O'Brien of Chase telephoned Joseph Gallegher of Equibank and Robert Carey of Rouse to inquire whether the Chase Loan would close. O'Brien was informed that although both Equibank and Associates were anxious for the Chase Loan to close, it did not appear likely that the closing could take place by March 30, 1973.

In order to protect Chase's rights, O'Brien then concluded that Chase should call the Letter of Credit, and on March 27, 1973 he telephoned Equibank and spoke with a Bonnie Anderson about doing so. He was advised that he should address a demand to Equibank requesting payment under the Letter and setting forth the date and number of the Letter. On the same day, O'Brien caused a telex to be sent by Chase to Equibank requesting payment, which was replied to on March 28, 1973 by telex from Equibank stating that the Letter of Credit was extended to April 13, 1973. This telex concluded "airmailing confirmation", and during the first week in April an officer of Chase again asked about the prospects for closing the Loan by April 13, 1973. The following week Chase received a document dated April 11, 1973, further extending the expiration date of the Letter of Credit as noted above to April 30, 1973.

Finally, after many communications between Equibank and Chase concerning the details of the loan papers, a closing was agreed to for April 27, 1973 at the law offices of Chase's attorney. Neither representatives of Equibank nor Associates appeared at the scheduled time and place. Equibank was contacted and Chase was informed that the closing could not be held because of inadequate cooperation from Associates

---

er to the Bank an irrevocable letter of credit in form and substance and issued by an institution satisfactory to the Bank in the sum of $108,000 simultaneously with your acceptance of this commitment. The letter of credit, by its terms shall expire not earlier than November 1, 1972 and shall provide that drafts may be drawn thereunder by the Bank on its certification that there has been a default under this commitment as the same may be amended from time to time in the future. You agree that the Bank may draw on such letter of credit if the loan is not closed in accordance with this commitment (for any reason other than the Bank's default) and the Bank agrees to surrender said letter of credit to you if the loan closes in accordance with this commitment.

You shall pay the fees and commissions of all brokers and other persons in connection with this transaction and shall defend and indemnify the Bank against all claims for such fees and commissions."

3. Thereafter, Chase dealt exclusively with representatives of Equibank and had little or no direct contact with Air-North, thereby assuming that Equibank in effect represented both Equibank and the Borrower. (Ryan, Lambert, and Caffuzzi Affidavits).

and its counsel, but that Associates desired to meet with Chase on the following Tuesday, May 1st, to discuss the renegotiation of the Chase Loan. On the same day, however, one of the principals of Associates called Chase and blamed the closing delay on Equibank, but also asked for the meeting on May 1, 1973.

Again, Chase determined to act on the Letter of Credit, and on April 27, 1973, Robert Lambert of Chase sent a telex to Equibank, identical to that which had been sent on March 27th, demanding payment on the Letter of Credit.[4] When nothing was heard from Equibank, the testimony shows that on April 30, 1973, Lambert again called Anderson to inquire as to Equibank's receipt of the telex and Anderson said that it had been received and was being given attention. Later in the day, another officer of Equibank requested that Chase send a formal draft and letter of default to Equibank. Lambert stated that Chase would comply and said he would have the necessary documents forwarded to Equibank in due course through its Domestic Collections Department. There is substantial dispute as to whether or not Equibank agreed to this procedure.

On May 7, 1973, Chase issued a formal sight draft and collection letter to which Equibank replied on May 17, 1973, by dishonoring the Letter of Credit for: "Late presentation of documents. (Expiration date was April 30, 1973. Documents received May 10, 1973) Draft does not indicate our Letter of Credit number as required in the original credit."

When payment was further denied, Chase brought this action in which it contends that all of the conditions precedent to payment under the Letter of Credit have been performed. Chase also contends that Equibank waived technical compliance with the terms of the Letter of Credit by not so informing it in response to the telex and telephone calls.

## DISCUSSION.

### I.  Chase v. Equibank

██ Historically, a Letter of Credit is an assurance of payment upon certain terms and conditions, substituting the acceptable credit standing of a bank or other person for the unknown or doubtful standing of a borrower.[5] It differs from the classical surety undertaking in that it is a primary obligation between the issuer and the beneficiary (Uniform Commercial Code, 12A P.S. § 5–114(1), Comment 1), and for this reason, the recipient of the Letter is isolated from the arrangement between the issuer and the borrower. In construing the terms of a Letter of Credit, the same general principles apply which govern other written contracts. Camp v. Corn Exchange National Bank, 285 Pa. 337, 132 A. 189 (1926). (Uniform Commercial Code, 12A P.S. § 5–101). Except insofar as expressly incorporated therein, the bank's contract with its customer for the Letter of Credit is separate and distinct from the contract which exists between the creditor and the customer/borrower. Venizelos, S.A. v. Chase Manhattan Bank, 425 F.2d 461 (2d Cir. 1970).

Chase contends that Equibank breached the contract by failing to honor its telex when presented, as of April

---

4.  The telex stated:
    "PLEASE REMIT BY WIRE FEDERAL FUNDS ON MONDAY, APRIL 30, 1973 FOR $108,000.00 RE LETTER OF CREDIT # 3531 TO YOUR ACCOUNT AT CMB ACCOUNT # 920–1–038693. SEND MESSAGE LLOYD E. LAMBERT, REAL ESTATE AND MORTGAGE LOAN DEPARTMENT, 33RD FLOOR, 1 CHASE MANHATTAN PLAZA. THANKS."

5.  12A P.S. § 5–103(1)(a) provides in pertinent part as follows:
    "'Credit' or 'letter of credit' means an engagement by a bank or other person made at the request of a customer . . . that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. . . . ."

30, 1973, in that there were only "technical deficiencies" in its certification of Air-North's default which Equibank knew about, even better than Chase. Therefore, it is alleged that Equibank cannot suffer any prejudice whatsoever with regard to any deficiency in certification. Further, Chase maintains that late presentation of the documents was caused by Equibank's silence on April 30, 1973, when informed that the documents would be forwarded through Chase's Collection Department in due course. It is Chase's position that Equibank thereby waived any defects in documentation.

Equibank, on the other hand, argues that the telex was not a sight draft as specifically required by the Letter of Credit, and that even if it were, it would still have been bound to dishonor it because of the manner of its presentment without the necessary accompanying documentation. Additionally, Equibank specifically denies any waiver on its behalf by anyone, and submits an Affidavit of the officer who talked with Lambert of Chase on April 30, 1973, to support this position.

■ In order for Summary Judgment to be granted by the Court, there must be no genuine issue as to any material fact, and the moving party must be entitled to judgment as a matter of law. (Rule 56 Fed.R.Civ.P.). In this case, under the affidavits, the Court feels that the issues cannot be decided by means of Summary Judgment Motions, due to substantial factual dispute on the question of waiver. On the matter of whether or not the telex was a draft under the Letter of Credit, the Court will decide that question.

Under the Uniform Commercial Code, as adopted in Pennsylvania (12A P.S. § 5–114(1)), it is provided that:

"An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the . . . documents conform to the underlying contract . . . between the customer and the beneficiary. The issuer is not excused from honor of such a draft or demand by reason of an additional general term that all documents must be satisfactory to the issuer, but an issuer may require that specified documents must be satisfactory to it."

A sight draft is an order for the immediate payment of money from a bank. In the instant case, the telex in question contained a direction that money be transferred to Equibank's account at the Chase Bank in New York. Equibank argues that this was not a demand and, therefore, the telex could not be considered a draft. However, Comment 2 to Section 3–102 of the Uniform Commercial Code states:

" . . . In the case of orders the dividing line between 'a direction to pay' and 'an authorization or *request*' may not be self-evident in the occasional unusual, and therefore non-commercial, case. The prefixing of words of courtesy to the direction—as 'please pay' or 'kindly pay'—should not lead to a holding that the direction has degenerated into a mere request. . . . " (Emphasis added).

■ Ordinarily a Court may resort to the custom and practice of commerce to aid in resolving a question such as this, but here neither party presented any evidence of the normal banking practice. Upon examination of this particular transaction, however, we conclude that the telex of April 30, 1973 meets the requirements of a sight draft. Chase intended it to be a draft, and it was so treated by Equibank upon receipt.[6]

6. *See generally,* United Milk Prod. Co. v. Lawndale Nat. Bank of Chicago, 392 F.2d 876 (7th Cir. 1968), where a bank was held to have properly transferred corporate funds pursuant to a letter and telegram, when a specific bank resolution required transfer only pursuant to check. The Court found that the letter and telegram satisfied the requirements of the Uniform Commercial Code. *Cf.,* Liberty Nat. B. & T. Co. v. Bank of America T. & S. Ass'n., 218 F.2d 831 (10th Cir. 1955), where the issuing bank

■ We are unable to conclude on the basis of the present record, however, whether Equibank was acting within its rights in refusing to honor the telex for improper documentation. The resolution of that question depends upon whether, under all of the circumstances as found by the fact finder, Equibank misled Chase into believing full compliance with the Letter of Credit was not required.

In Courtaulds No. America, Inc. v. North Carolina Nat. Bank, 387 F.Supp. 92, 105 (M.D.N.C.1975), the Court stated (at p. 105):

"  .   .   .   [T]he issuer cannot be permitted to deal with a beneficiary over an extended period of time, realizing a potential discrepancy exists and, in effect, lie in wait to ambush the beneficiary with this defense if the transaction goes sour. To allow a bank issuing a letter of credit to waive discrepancies without notice to the beneficiary and without modifying its right to strict compliance with the terms of the letter would be tantamount to offering the issuer a free way out of its contractual obligation if the bargain became unfavorable.   .   .   . "

In our situation, two identical telex demands were sent; one in March and one in April, 1973. In answer to the first, Equibank elected to extend the Letter of Credit to April 30, 1973. In response to the second telex, an officer of Equibank, Harry Neiman, called upon Chase for further documentation, apparently without any time discussion.

We must determine the following: Did Harry Neiman agree with Lloyd Lambert's suggestion that the necessary documents could be sent through normal channels (the effect of which would be to extend the Letter of Credit past April 30th) as stated in Lambert's Affidavit, or, did Neiman at no time agree with Lambert's suggestion and/or waive any of the requirements of the Letter of Credit, as stated in Neiman's Affidavit. A resolution of this question is critical to the outcome of this case.

Thus, Barclays Bank D.C.O. v. Mercantile National Bank, 481 F.2d 1224, 1236 (5th Cir. 1973), cert. denied, 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96, held (at p. 1236):

"  .   .   .   Since Allied's letter of credit did not expire until June 15, 1971, if Mercantile had notified Barclays on June 9, 1971, that the documentation furnished was improper, Barclays might have remedied the defect. To allow Mercantile to raise this defense, founded upon its own admitted mistake and after affirmatively stating that all required documentation was present, would not comport with our abstract sense of justice, nor, and more importantly, with the rule applied in cases involving letters of credit that '[b]y formally placing its refusal to pay on one ground, the defendant must be held to have waived all others.' [citations omitted]"

We conclude that genuine issues of fact remain for the finder of fact to determine. It is possible that since the Letter of Credit did not expire until the close of business on April 30th, Chase could have supplied the proper documents had Neiman resisted their being sent through normal channels. It would also be possible to find that Chase knew it had to comply by April 30th, and that Neiman never waived this requirement. Therefore, the Cross-Motions for Summary Judgment on the issue of the Letter of Credit as between Chase and Equibank must and will be denied.

## II. Pitt-Bethel—Air-North

The pleadings, affidavits, and other documents, disclose that the original commitment letter of Chase called for

---

sent a telegram stating "Authorize payment Geneva on receipt of *cable* advise" (emphasis added) and where it was held that since the telegram was free from ambiguity, it constituted a waiver of the receipt of the documents by the issuing bank, and that the cablegram was sufficient documentation of the specified documents.

the payment of $108,000 by the borrower in consideration for Chase's efforts in procuring the loan. However, as previously noted, this letter was modified several times, and finally required that a Letter of Credit issue from a bank found satisfactory by Chase.

In Fidelity Bank v. Lutheran Mutual Life Insurance Co., 465 F.2d 211 (10th Cir. 1972), a case not unlike the instant one, the Court was concerned with an irrevocable Letter of Credit issued on a loan commitment agreement for construction funds. It was found there that the property which was to be the subject of the loan was not security for the Letter of Credit, and the Court held that where the Letter of Credit is complete in itself, there is no reason to consider the underlying contract. (Citing to § 5–104(1) of the Uniform Commercial Code). There, as in this case, the loan commitment and the Letter of Credit were each separate contracts. Under a Letter of Credit the issuing bank is required to comply with the terms of the Letter of Credit regardless of the relationship between the borrower and the beneficiary. Lamborn v. National Bank of Commerce of Norfolk, 276 U.S. 469, 48 S.Ct. 378, 72 L.Ed. 657 (1928); Barclays Bank D.C.O. v. Mercantile National Bank, supra; Wichita Eagle & Beacon Pub. Co. v. Pacific Nat. Bank of S.F., 343 F.Supp. 332 (N.D. Cal.1971), rev'd on other grounds, 493 F.2d 1285.

Under the original commitment letter, Chase looked to Pitt-Bethel to supply $108,000 in cash, as a good faith assurance that the loan would be closed.[7] Subsequently, for whatever reason, Chase agreed to accept the Letter of Credit of Equibank as its guaranty that Air-North would close in accordance with the modified commitment letter.

We conclude, therefore, that Chase's recourse at this juncture is to look to Equibank alone. Thus, Pitt-Bethel and Air-North's Motion for Summary Judgment must be granted as far as liability is predicated on the Letter of Credit.

### III. The Counterclaim

The matter of the Counterclaim for $9,500 against Chase by Pitt-Bethel and Air-North is another matter. Paragraph C of the commitment letter provides, in pertinent part, as follows:

"C. Your acceptance hereof shall constitute your agreement to pay or cause to be paid, whether or not the loan is closed, all fees and expenses of the Bank in connection with the loan, including charges for examination of the approved plans, appraisal fee, supervising architect's or engineer's fee, counsel fees (New York and Pennsylvania), charges for title examination and insurance and surveys, recording fees and such other out-of-pocket expenses as the Bank shall reasonably incur, and upon acceptance hereof you shall deposit with the Bank the sum of $25,000 on account of the aforesaid charges, fees and expenses."

Pitt-Bethel deposited the $25,000 as required with Chase and now contends they are entitled to the return of the balance of $9,500, after crediting expenses of the loan. Under the broad language of Paragraph C of the commitment letter, Chase contends that they are entitled to hold the $25,000 as reimbursement security for the expenses of this litigation which, according to Lambert's Affidavit, so far substantially exceeds the balance remaining not expended on the loan itself.

We find that the extent of the liability of Pitt-Bethel and Associates under the terms of Paragraph C is limited to "all fees and expenses . . . including charges for examination of the approved plans, appraisal fee, supervising architect's or engineer's fee, counsel fees (New York and Pennsylvania),

---

7. See Footnote 2, ante.

charges for title examination and insurance and surveys, recording fees and such other out of pocket expenses . . . .", and they are not liable for the expenses of default. The $108,000 was set aside for such eventuality, and we have determined that Chase must look to Equibank for any recovery in this regard. We cannot lay these expenses on Pitt-Bethel or Associates when the contract does not specifically so provide.

Therefore, judgment will be entered on the Counterclaim of Associates and Pitt-Bethel for $9,500 less credit for any counsel fees due Milbank, Tweed, Hadley & McCloy for closing services. The amount of these fees are to be agreed upon and submitted to this Court within ten days from the date of the Order, or further hearing on the issue of credit only will be required.

An appropriate Order will be entered.