**WEST VIRGINIA HOUSING DEVELOPMENT FUND**

v.

**John E. SROKA et al.**

**Civ. A. No. 74–532.**

United States District Court,
W. D. Pennsylvania.

April 16, 1976.

Raymond Hasley, Pittsburgh, Pa., for plaintiff.

John Lukens, Charleston, W. Va., Morton Meyers, Johnstown, Pa., Harold Gondelman, James Villanova, Pittsburgh, Pa., for defendants.

**MEMORANDUM: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND HUD'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

KNOX, District Judge.

This litigation represents an attempt to sort out part of the financial responsibility for the failure of a low-cost housing development, the Bridgeport Gardens, located at Bridgeport, Harrison County, West Virginia. There are four parties to this case: West Virginia Housing Development Fund (hereinafter The Fund), John E. Sroka, The United States National Bank, (hereinafter The Bank) and James T. Lynn, Secretary of the Department of Housing and Urban Development (hereinafter HUD).

While the record of this case is replete with allegations as to who was responsible for the demise of the Bridgeport Gardens, the issue presently before the court can be simply put: Who is liable to the plaintiff for the sum of $66,350? No one appears to dispute the fact that the plaintiff is entitled to this money.

The relationship of these four parties to the Bridgeport Gardens is as follows: The Fund is a government instrumentality and public body corporate of the State of West Virginia, created under Chapter 31, Article 18, Section 1, et seq., of the Code of West Virginia, 1931, as amended. This Fund was created to fulfill certain public purposes, including the financing of residential housing. The Fund executed a loan of $3,317,-500 to the Bridgeport Gardens Associates, a West Virginia limited partnership of which John E. Sroka was a general partner. This partnership was the general developer responsible for completion of the project. The initial closing of this loan took place on April 24, 1972, at the office of the Federal Housing Commissioner in Charleston, West Virginia.

HUD was related to the project as an insurer. On March 31, 1972, HUD issued to the Fund a "Commitment for Insurance of Advances". Under this commitment, the Federal Housing Commissioner agreed to endorse for insurance the mortgage note of

$3,317,500 executed between the Fund and the Partnership.

The final party in this picture is the Bank which issued a letter of credit to the plaintiff on April 24, 1972. This letter of credit was required as part of the contract between the Fund and HUD as will be discussed in detail in Part II of this memorandum.

On or about May 1, 1973, the Partnership defaulted on the terms and conditions of the loan from the Fund. At this time, the unpaid balance of the loan was $764,868.25. HUD paid the plaintiff this full sum but deducted the amount of the letter of credit —$66,350. On August 3, 1973, the plaintiff executed and forwarded a sight draft to defendant seeking payment of the letter of credit. On August 8, 1973, the bank notified the plaintiff of its dishonor of the letter of credit.

The plaintiff instituted this cause of action on June 5, 1974, seeking payment of the $66,350 from all three of the other parties to the transaction. On July 17, 1974, Sroka filed a crossclaim against HUD. Schematically, the posture of the case looks like this:

| | |
|---|---|
| The Fund (plaintiff & mortgagee) | vs. The Bank (issued letter of credit) |
| | vs. Sroka (mortgagor) |
| | vs. |
| | vs. HUD (insurer) |

On December 12, 1975, the plaintiff filed a motion for summary judgment against the Bank. And on January 5, 1976, HUD filed a motion to dismiss or in the alternative for summary judgment on both the claims of plaintiff and the crossclaim of Sroka. The court will grant both motions.

To sort out this confusing tangle of affairs, the court will focus successively upon three aspects of these transactions: (I) The letter of credit transaction, (II) The insurance agreement between HUD and the Fund, and (III) The relationship between HUD and Sroka.

## I. The Letter of Credit Transaction.

Initially, it is necessary to explain the nature of a letter of credit and the legal relationships it creates. In the case of *Chase Manhattan Bank v. Equibank*, 394 F.Supp. 352 (W.D.Pa.1975), Judge Snyder of this court defined a letter of credit as follows, at p. 355:

"Historically, a Letter of Credit is an assurance of payment upon certain terms and conditions, substituting the acceptable credit standing of a bank or other person for the unknown or doubtful standing of a borrower. It differs from the classical surety undertaking in that it is a primary obligation between the issuer and the beneficiary, and for this reason, the recipient of the Letter is isolated from the arrangement between the issuer and the borrower. In construing the terms of a Letter of Credit, the same general principles apply which govern other written contracts. Except insofar as expressly incorporated therein, the bank's contract with its customer for the Letter of Credit is separate and distinct from the contract which exists between the creditor and the customer/borrower." (Citations omitted.)

Chief Judge Daugherty of the Western District of Oklahoma defined a letter of credit in somewhat different language:

"A letter of credit is essentially a third party beneficiary contract. A party wishing to transact business induces a bank to issue the letter to a third party. It is a contract between the procuring customer and the issuing bank for the benefit of the payee-beneficiary. In the ordinary letter of credit situation, at the request of one of its customers a bank issues directly to a third party a promise to pay a sum of money on being furnished with certain documents. . . . As an element of his contractual undertaking, the issuer must honor any draft

**1110**

or demand for payment which complies with the terms of the credit."

*Harvey Estes Construction Company v. Dry Dock Savings Bank of New York,* 381

F.Supp. 271 (W.D.Okl.1974) (Citations omitted).

Schematically, then, there are three parties to a letter of credit:

The parties to the letter of credit involved in this case can be inserted in the above schematic as follows:

It should be noted that HUD is *not* a party to this arrangement, although the letter of credit was procured as part of the Fund's contractual obligations to HUD. (These contractual provisions will be discussed in Part II of this memorandum.)

Liability on the letter of credit presents solely *legal* issues and thus can be disposed of by the court on a motion for summary judgment. In the case of *Tomalewski v. State Farm Life Insurance Com-*

*pany*, 494 F.2d 882 (3 Cir. 1974), the court said:

> "If the pleadings and proof in the form of depositions, affidavits and admissions on file disclose that no real cause of action or defense exists, the court may determine there is no issue to be tried and may grant a summary judgment."

An examination of the record of this case discloses no defense to the bank's obligation to pay the letter of credit and summary judgment will therefore be entered on this issue.

The following four questions detail the available defenses of the bank under Article Five of the Uniform Commercial Code:

(1) Was the letter of credit revocable?

(2) Was the letter of credit revoked?

(3) Was the plaintiff's demand for payment improper?

(4) Did Sroka notify the bank of a legitimate defense of fraud?

All four of these questions can be answered in the negative mandating payment of the letter of credit by the bank.

The first issue to be considered is the alleged condition attached to the letter of credit. The letter of credit reads as follows:

> "Letter of Credit
>
> | | |
> |---|---|
> | Applicant: | John E. Sroka<br>422 Lincoln Street<br>Johnstown, Pennsylvania |
> | Beneficiary: | West Virginia Housing Development Fund<br>900 Charleston National Plaza<br>Charleston, West Virginia 25301 |
> | Amount: | $66,350.00 |
> | Project: | Bridgeport Gardens<br>Project #045–44005–LD<br>Bridgeport, West Virginia |
>
> We hereby issue this credit which is payable at the counters of the U. S. National Bank, Johnstown, Pennsylvania against Beneficiary's draft at sight drawn on U. S. National Bank, Johnstown, Pennsylvania.
>
> Applicant informs us that this letter of credit relates to working capital funds for the captioned project.
>
> S/ A. H. Wagner, Vice President"

Of course, the last sentence constitutes the language in dispute.

Article 5–103(1)(a) provides for both revocable and irrevocable letters of credit. The former is, in reality, an illusory contract because Article 5–106(3) provides that:

> "Unless otherwise agreed after a revocable credit is established it may be modified or revoked by the issuer without notice to or consent from the customer or beneficiary."

Sroka's argument is somewhat of a variation of 5–106(3) because he alleges that the letter of credit was revocable until the time that a condition precedent to its validity occurred: that a need for working capital funds arise for the Bridgeport Gardens Project. Sroka's argument must be rejected for several reasons.

Comment one to Article 5–103 states the following:

> "Neither the definition nor any other section of this Article deals with the issue of

when a credit, not clearly labelled as either revocable or irrevocable falls within the one or the other category although the Code settles this issue with respect to the sales contract (Section 2—325). This issue so far as it effects an issuer under the Article is intentionally left to the courts for decision in the light of the facts and general law (Section 1—103) with due regard to the general provisions of the Code in Article 1 particularly Section 1—205 on course of dealing and usage of trade."

Thus, the court receives only minimal guidance from Article Five of the Uniform Commercial Code in determining whether this letter of credit is revocable and must look to "the facts and general law."

■ Part of the relevant general law constitutes the normal principles governing interpretation of contracts, as Judge Snyder in the *Chase Manhattan Bank* case, discussed on page 1109, supra, pointed out. One such general proposition of contract law that the courts have applied to letters of credit is "to take the words as strongly against the issuer as a reasonable reading will justify". This proposition, of course, militates against reading conditions into the bank's obligations. *Fair Pavilions, Inc. v. First National City Bank*, 24 A.D.2d 109, 264 N.Y.S.2d 255 (1965), reversed on other grounds 19 N.Y.2d 512, 281 N.Y.S.2d 23, 227 N.E.2d 839 (1967).

■ A second proposition the courts have applied to interpreting the terms of letters of credit is that "a construction that will make the letter valid and enforceable will be preferred to one that will defeat it". *Dynamics Corp. of Amer. v. Citizens and Southern National Bank*, 356 F.Supp. 991 (N.D.Ga.1973). This proposition is also clearly apposite because, as discussed above, revocable letters of credit amount to illusory contracts under Article 5.

■ A second reason for rejecting Sroka's argument involves consideration of the purpose and function of the letter of credit. As discussed above, the arrangement is essentially an attempt to substitute the credit of the issuing bank for that of a customer. It is a form of guaranteeing payment. Like negotiable instruments, the letter of credit is a means of facilitating commercial transactions. Comment one to Article 5–114 states the following:

"The letter of credit is essentially a contract between the issuer and the beneficiary and is recognized by this Article as *independent* of the underlying contract between the customer and the beneficiary." (Emphasis added.)

The nature of the bank's duties to its customer are outlined in Article 5–109:

"An issuer's obligation to its customer includes good faith and observance of any general banking usage but unless otherwise agreed does not include liability or responsibility

(a) for performance of the underlying contract for sale or other transaction between the customer and the beneficiary; or

(b) for any act or omission of any person other than itself or its own branch or for loss or destruction of a draft, demand or document in transit or in the possession of others; or

(c) based on knowledge or lack of knowledge of any usage of any particular trade."

Sroka's argument runs counter to the whole thrust of Article 5 in that it represents an attempt to drastically alter the bank's basic responsibilities as outlined in 5–109. Sroka's construction of this letter of credit makes it *dependent* on the performance of the underlying contract.

The language in this letter of credit is simply not strong enough to alter the normal operation of a letter of credit so drastically. As the plaintiff argues in his brief, the language in question "does not create a condition and is merely a recital of the reason the letter of credit was required."

It may finally be noted that the case of *Lindy v. Lynn*, 395 F.Supp. 769 (E.D.Pa. 1974), aff'd 515 F.2d 507 (3 Cir. 1975) (with-

out published opinion), provides support for the above analysis. This opinion will be discussed in further detail in part II of this memorandum because most of the discussion concerns HUD's right to offset the letter of credit. Nevertheless, it may be noted at this point that in a building contract transaction involving the same relationship among the mortgagor, mortgagee, HUD and the issuer of a letter of credit involved here, the court refused to enjoin the bank from paying the letter of credit at the request of the customer.

The second possible defense of the bank can be quickly disposed of. It is clear that a proper demand for payment was made by the plaintiff as required by Article 5–114. The sight draft reads as follows:

"SIGHT DRAFT

$66,350.00 Charleston, West Virginia
 August 3, 1973

At sight pay to the order of West Virginia Housing Development Fund, a governmental instrumentality and public body corporate, Sixty Six Thousand Three Hundred Fifty Dollars ($66,350.00), in accordance with that certain Letter of Credit which you issued to West Virginia Housing Development Fund, dated April 20, 1972, with respect to working capital requirments in connection with Bridgeport Gardens, FHA Project No. 045–44005–LD, Bridgeport, West Virginia.

TO: United States National Bank
 216 Franklin Street
 Johnstown, Pennsylvania 15901

 West Virginia Housing Development
 Fund, a governmental instrumentality
 and public body corporate

 By S/John W. Biacucci
 Executive Vice President

 900 Charleston National Plaza
 Charleston, West Virginia 25301"

There are no allegations that this sight draft does not conform to the terms of the credit as required by Article 5–114(1) or that the bank breached its responsibility to carefully examine the validity of documents as required by Article 5–109(2).

The third possible defense to payment is that the letter of credit was revoked. (The Code's discussion of revoking irrevocable letters of credit in Article 5–106(2) seems to involve some confusion of language.) On July 27, 1973, Sroka sent the following letter to the bank:

"On April 20, 1972, you issued a Letter of Credit to the West Virginia Housing Development Fund to cover a projected working capital account for operations in connection with the above-captioned project.

"Since this project will not materialize this Letter of Credit will no longer be necessary and I request that you cancel same effective immediately."

Since the court has already determined that this letter of credit is irrevocable, it can be revoked or modified only with the beneficiary's consent pursuant to Article 5–106(2). Since the plaintiff has obviously not consented to a revocation, clearly Sroka's letter could not operate as such.

The final possible defense of the Bank is that Sroka's letter may constitute notice of *fraud* pursuant to Article 5–114(2)(a). It appears to the court from studying comment 2 to Article 5–114[1] and the text of

1. When, however, no innocent third parties as defined in subsection (a) are involved the issuer is no longer under a duty to honor; but since these matters frequently involve situations in

the code itself that 5–114(2)(a) raises defenses when innocent third parties are involved but that 5–114(2)(b) is the proper section to apply when, as here, solely the original parties to the transaction are involved and the bank receives a direction from its customer to stop payment.

Article 5–114(2)(b) reads as follows:

"(b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor."

 While this language is not as clear as it could be, the court understands it to mean the following. If the bank has received no notice of fraud, forgery, or of a defect on the instrument, it has no privilege to dishonor. If the bank receives notice of any one of these defenses, it has the option to either dishonor or to honor.

 Neither the Code nor its comments give any hint as to what type of fraud gives the bank an option to pay or not to pay under this section. It is the court's conclusion that the traditional elements of common law fraud are not present here. While the courts have been reluctant to define fraud, it generally is thought to include an element of intentional misrepresentation in order to profit from another. See 37 Am. Jur.2d § 1, et seq., Fraud and Deceit; Devitt and Blackmar, Federal Jury Practice and Instructions Civil and Criminal Sections 16.05, 16.06.

Sroka's answer makes the following allegations in relationship to possible fraud:

"Defendant avers that the attempt by plaintiff to draw on the funds represented by said letter of credit was in bad faith and knowingly done when the plaintiff knew or had reason to know that the funds represented by said letter of credit were no longer available to plaintiff by reason of the default in the completion of said project."

 The underlined words represent the fallacy in Sroka's argument. The alleged unfair conduct on plaintiff's part related to its attempt to collect on the letter of credit after the project was abandoned. The court has previously held that the performance of the underlying contract was *irrelevant* to the Bank's obligations under the letter of credit. The court fails to see how any fraud can be involved in regard to matters that are collateral to the bank's obligations under the letter of credit.[2]

The court has examined those cases which have given a broad interpretation to fraud under Article 5–114(2)(b) because "the principle of the independence of the bank's obligation should not be extended to protect an unscrupulous beneficiary". *Dynamics Corp. of Amer. v. Citizens Southern National Bank,* 356 F.Supp. 991, 998 (N.D. Ga.1973). See also *Sztejn v. J. Henry Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941); *Merchants Corp. of Amer. v. Chase Manhattan Bank, N.A.,* 5 U.C.C.Rep.Serv. 196 B (N.Y.Sup.Ct. 1968).

This case differs from the above cited cases in that there is nothing unscrupulous about the plaintiff's conduct. Its sole relation to the Bridgeport Gardens was to loan money. There is no indication that it failed to do so and when the project failed it sought reimbursement for funds expended as it was entitled to do in its contract with HUD. All of Sroka's claims of estoppel and unfair dealing are alleged against HUD and not the plaintiff except in the one regard

---

which the determination of the fact of the nonconformance may be difficult or time-consuming, the issuer if he acts in good faith is given the privilege of honoring the draft as against its customer, that is to say, with a right of reimbursement against him. The issuer may, however, refuse honor."

**2.** The deposition of Mr. Sroka bears out the absence of any unclean hands on plaintiff's part in any other way. "Are you charging in your answer or do you charge, Mr. Sroka, that the plaintiff, Housing Fund, in any manner, whether through affirmative action or inaction or omission in any way acted to your detriment in this matter?" "No, I don't think so. I can't see where they did in any way."

alleged above. (The court has studied Sroka's deposition as well as all the pleadings, briefs, and transcripts in this case.) In sum, the same reasons which make performance of the construction contract irrelevant to the revocability of the letter of credit also defeat Sroka's claim of fraud.

The bank will therefore be directed to pay the letter of credit. Under Article 5–114(3), the bank is entitled to reimbursement from its customer Sroka, but this matter is not now before the court.

## II. *The claims of Plaintiff against HUD.*

As with the issue of liability on the letter of credit, the issues of HUD's liability to the plaintiff and on the crossclaim to Sroka present solely legal issues under the *Tomalewski* test, supra, which can be appropriately disposed of on a motion for summary judgment. There are no disputed issues of material fact because HUD's responsibilities to the plaintiff are clearly spelled out in the contracts between the parties and in the statutes and regulations of HUD dealing with transactions of this type.

The mortgagee's certificate executed between the Fund and HUD provided for a working capital deposit to be supplied by the Fund.[3] Such a deposit is required as a condition of loans to mortgagees by HUD.[4] HUD's regulations permit this deposit to take the form of a cash deposit or of an irrevocable and unconditional letter of credit.[5]

The Commitment for Insurance of Advances executed between the Fund and HUD incorporates by reference the provisions of ¶ 236 of the National Housing Act.[6] One of these statutory provisions (12 U.S.C. 1713(g)(5) requires that the mortgagee deliver "[all] deposits made for the account of the mortgagor" to HUD as a condition of receiving an insurance payment upon default by the mortgagee.[7] The implementing HUD regulations also mandate the same result.[8]

The National Housing Act and the implementing HUD regulations thus allow for an offset of working capital deposits to HUD's insurance obligations. The Building Loan Agreement also envisages that the final

3. "The undersigned has received from the Mortgagor a working capital deposit in the form of _____ in the sum of $66,-
(Cash)–(Letter of Credit)
350.00. . . . it is understood that funds in this deposit be released or allocated for the purposes indicated by law and for no other purpose unless approved by you:

(1) Primarily for meeting the cost of equipping and renting the project subsequent to substantial completion of construction of the project;

(2) Also, in our discretion, for accruals during the course of construction for mortgage insurance premiums, taxes, ground rents, property insurance premiums and assessments, when funds available for these purposes under the Building Loan Agreement have been exhausted; and also for allocation to such accruals after completion of construction if the income from the project, at that time is insufficient to meet such accruals.

4. See HUD Regulations (24 CFR 221.540(a), (e)) incorporated by reference in 24 CFR 236.1.

5. "The mortgagee may accept, in lieu of a cash deposit required by subparagraphs (1), (3), (4), and (6) of this paragraph, an unconditional irrevocable letter of credit issued to the mort-

gagee by a banking institution. In the event a demand under the letter of credit is not immediately met, the mortgagee shall forthwith provide cash equivalent to the undrawn balance thereunder."

6. "The Federal Housing Commissioner, acting herein on behalf of the Secretary of Housing and Urban Development, will endorse for insurance under the provisions of Section 236 of the National Housing Act, and the Regulations thereunder now in effect, a mortgage note in the amount of $3,317,500 . . .

7. "any cash or property held by the mortgagee, or to which it is entitled, as deposits made for the account of the mortgagor and which have not been applied in reduction of the principal of the mortgage indebtedness; . . .

8. This statute is implemented in the HUD Regulations (24 CFR 207.258(b)(4)(ii) and (iii), which provide that the mortgagee shall account to the Secretary for:

(ii) Any cash held by the mortgagee or its agents or to which it is entitled, including deposits made for the account of the mortgagor, and which have not been applied in reduction of the principal of the mortgage indebtedness.

(iii) All funds held by the mortgagee for the account of the mortgagor received pursuant to any other agreement."

disposition of the working capital deposit is subject to HUD's control.[9]

Entirely apart from the contracts, statutes, and regulations discussed above, the court's previous ruling on the bank's liability under the letter of credit appears to foreclose liability on HUD's part for the same money. Finally, it may be noted that the case of *Lindy v. Lynn,* 395 F.Supp. 769 (Weiner, J.) (E.D.Pa.1974) aff'd (without opinion) 515 F.2d 507 (3 Cir. 1975), sustained HUD's right to set off working capital deposits. *Lindy* involved the same four parties as does this case: mortgagor (developer), mortgagee, insurer (HUD), and the Bank which issued a letter of credit. The court rejected the plaintiff's argument that "the funds were provided for the interim or financing of the project and since construction never commenced, the purpose for which the fund was created never became operative". 395 F.Supp. at 772. The court concluded that the working capital deposit could not be considered to be "a special purpose fund" precluding offset.

 In reliance on the *Lindy* case, on the contracts between the parties to this case, and on the statutes and regulations governing HUD, the court will grant HUD's motion for summary judgment in regard to the plaintiff's claim.

### III. *The Crossclaim of Sroka Against HUD*

What the court has previously said with respect to the claims of plaintiff against HUD apply with equal force to the crossclaim of Sroka against HUD. Sroka's crossclaim against HUD "asserts that in the event he is found to be liable to the plaintiff in the above cause of action that he has a crossclaim over against the co-defendant James T. Lynn, Secretary of HUD . .". The court has entered judgment in favor of plaintiff and against the defendant United States National Bank on their letter of

credit. If the bank should pay the letter of credit to plaintiff then plaintiff would have no further claim against Sroka since it is not entitled to double recovery and the claim of the plaintiff against Sroka would have to be dismissed or summary judgment entered. The crossclaim by Sroka against HUD would therefore fail because Sroka has not been compelled to pay anything. The bank has no crossclaim against Sroka and we are therefore not in a position to adjudicate the rights of the bank versus Sroka at this time.

 It would appear, however, for the reasons above set forth with respect to the claim against HUD, that the crossclaim of Sroka against HUD will eventually fail. In the first place in addition it appears that there was no contractual relationship between HUD and Sroka, HUD being merely the guarantor of the mortgage under circumstances above set forth. In the second place, Sroka's claim of estoppel against HUD would seem doomed to failure under the doctrine of refusal to allow estoppel to run against the government unless officers have acted within the scope of their authority. See *Wilber National Bank v. U. S.,* 294 U.S. 120, 55 S.Ct. 362, 79 L.Ed. 798. It does not appear that any officer was authorized to do what is claimed to have given rise to the estoppel in this case and, in any event, any such claim is foreclosed by the decision of this court per Judge McCune in *Brown v. Richardson,* 395 F.Supp. 185 (W.D.P.1975). It this is a claim of some sort for violation of contract against the United States, it would appear that this court has no jurisdiction under the decision of the Third Circuit in *Lindy v. Lynn,* 501 F.2d 1367 (3 Cir.) cited, supra.

It has also been held that such a claim by Sroka against HUD must fail because of the doctrine of governmental immunity. See *Modular Technics Corp. v. South Haven Houses,* 403 F.Supp. 204 (E.D.N.Y.1975).

9. "If the Lender so elects to terminate this agreement [after a default], it may use and apply any funds deposited with it by the Borrower, regardless of the purpose for which

such funds were deposited, in such manner and for such purposes as the Commissioner may prescribe."

In any event at the present time, there is no basis for any recovery by Sroka against HUD and we will therefore grant the motion for summary judgment with respect to the crossclaim.

## ORDER

AND NOW, to wit, April 16, 1976, for reasons set forth in the accompanying memorandum and upon consideration of the briefs and arguments of the parties,

IT IS ORDERED that summary judgment be and the same hereby is entered in favor of plaintiff West Virginia Housing Development Fund and against the defendant United States National Bank, a national banking association in the amount of $66,-350.00, together with interest thereon from August 8, 1973.

IT IS FURTHER ORDERED that summary judgment be and the same hereby is entered in favor of James T. Lynn now Carla Hills, Secretary of Department of Housing and Urban Development of the United States of America with respect to the claim of the plaintiff against the said defendant.

IT IS FURTHER ORDERED that summary judgment be and the same hereby is entered in favor of the defendant James T. Lynn, now Carla A. Hills, Secretary of the Department of Housing and Urban Development of the United States with respect to the crossclaim of defendant John A. Sroka against the said defendant Secretary of the Department of Housing and Urban Development.