**DYNAMICS CORPORATION OF AMERICA, Plaintiff,**

**v.**

**The CITIZENS AND SOUTHERN NATIONAL BANK, Defendant,**

**The President of India, Intervenor.**

**Civ. A. No. 17197.**

United States District Court,
N. D. Georgia,
Atlanta Division.

March 28, 1973.

Witte & Witte, Bronxville, N. Y., Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for plaintiff.

Alston, Miller & Gaines, Atlanta, Ga., for defendant.

Lefkoff & Hanes, Atlanta, Ga., and Baker, Nelson & Williams, New York City, for intervenor.

## ORDER

EDENFIELD, District Judge.

In this unusual diversity[1] case, which touches some of the political and legal consequences of the emergence in Asia of Bangladesh, the court is called upon to strike a balance between the principles of equity jurisprudence and the requirements of commercial law.

In March of 1971 plaintiff, Dynamics Corporation of America ["DCA"], entered into a contract [the "Agreement"] with intervenor, the President of India ["India"], under which DCA agreed to sell and India agreed to buy defense-related communications equipment for some $1.368 million. The Agreement obligated DCA both to deliver the equipment FOB its plant and to provide technical assistance and "know-how" to India. The Agreement contained an arbitration clause stipulating that any disputes arising out of or in connection with the Agreement would be arbitrated in New Delhi, India. The Agreement was to be governed by Indian law.

The United States, not a party to this suit, undertook to finance India's purchase of the DCA equipment through the Military Sales Credit program as part of the so-called Peace Indigo Project established by the United States and India. Under the elaborate payment procedure, DCA agreed to periodically prepare and submit invoices to the designated representatives of India in Washington, D. C. India agreed to forward these invoices to the United States Army with a request for payment accompanied by India's certification that (a) the equipment due to be delivered was received, or (b) the work or services promised by DCA were satisfactorily rendered, or (c) payment was otherwise due DCA. It appears that the United States agreed to deposit the amounts due on the invoices to the account of DCA at defendant bank, the Citizens and Southern National Bank [the "Bank"], upon receipt of the certified invoices from India. DCA further agreed to have the Bank issue irrevocable letters of credit in favor of India at intervals roughly corresponding to the periodic submissions of invoices by DCA to India. These letters of credit were to be for amounts corresponding to the amounts due on the invoices and were to be payable to India on demand by sight drafts accompanied by India's certifica-

---

1. Plaintiff alleges that (1) it is a New York corporation, (2) defendant is a Georgia corporation, and (3) the amount in controversy exceeds $10,000. *See* 28 U.S.C. § 1332(a)(1) (1970).

tion in an agreed form that DCA had failed to carry out certain of its obligations under the Agreement. They were to become effective upon the Bank's receipt of the amounts of the respective invoices in collected funds to DCA's account and were to be valid for limited periods of time.[2]

On April 14, 1971 DCA submitted its first invoice in the amount of $410,472.-60 to the designated representatives of India. On July 28, 1971 DCA had the Bank issue an irrevocable letter of credit (No. G–2076) in favor of India for the amount of $410,472.60 which was to become effective upon the Bank's receipt of that amount in collected funds to DCA's account and which was to be valid until September 30, 1972. The invoice was duly certified by India and on October 18, 1971 the United States paid the invoice by depositing $410,472.60 [the "Deposit"] to the account of DCA at the Bank. When the Bank received the Deposit the letter of credit in India's favor became operative as something akin to a lien on DCA's bank account.

DCA prepared two new invoices later in October of that year in the respective amounts of $88,216.80 and $230,700 and presented them for certification to the designated representatives of India. A fourth invoice in the amount of $410,472.60 was prepared and submitted on December 2, 1971. On December 29, 1971 DCA had the Bank issue three letters of credit in India's favor for the amounts of those invoices.

In the meanwhile India shifted its attention from commercial letters of credit to war with Pakistan over the Bengali situated in East Pakistan. In reaction to this war President Nixon announced a partial embargo of military supplies and the Indian Ministry of Defense was notified December 3, 1971 by the United States Army that an immediate ban on shipment of "ammunition, components thereto or machinery/equipment facilitating the manufacture of ammunition" was imposed. The ban apparently covered the DCA equipment ordered by India.[3]

2. For example, the first letter of credit issued by the Bank provided, in pertinent part, the following:

" * * * TO: THE PRESIDENT OF INDIA
India

BY ORDER OF: ELECTRONICS SYSTEMS DIVISION For account
OF DYNAMICS CORPORATION of same
OF AMERICA * * *

GENTLEMEN:

WE HEREBY ESTABLISH OUR IRREVOCABLE CREDIT IN YOUR FAVOR, FOR THE ACCOUNT INDICATED ABOVE, FOR A SUM OR SUMS NOT EXCEEDING IN ALL FOUR HUNDRED TEN THOUSAND FOUR HUNDRED SEVENTY TWO AND 60/100 US DOLLARS (US$410,-472.60)—AVAILABLE BY YOUR DRAFT(S) AT sight,

DRAWN ON: us

Which must be accompanied by:

1. Your signed certification as follows: 'The President of India being one of the parties to the Agreement dated March 14, 1971 signed and exchanged between The President of India and the Dynamics Corporation of America for the license to manufacture, purchase and supply of radio equipment as per Schedule I thereof for the total contract value of $1,368,242.00, does hereby certify in the exercise of reasonable discretion and in good faith that the Dynamics Corporation of America has failed to carry out certain obligations of theirs under the said Order/Agreement. * * *'"

————————◆————————

3. It appears the embargo has now been lifted and that India is free to obtain the DCA equipment. N.Y. Times, March 15, 1973, at 1, cols. 2–3.

Despite the protestations of DCA India has refused to certify the last three invoices submitted by DCA and those invoices have never been paid. By the same token the three letters of credit obtained by DCA in India's favor on December 29, 1971 have never become effective. On August 2, 1972 DCA filed a petition in bankruptcy in the Southern District of New York and in its complaint in this case it alleges that it was forced to do this as a result, in part, of nonpayments by India under the Agreement.

Some time later DCA says it was informed that India had lost interest in the Peace Indigo Project and intended, among other things, to make demand for the Deposit under the terms of the first letter of credit. On September 25, 1972 DCA filed a complaint in this court seeking an injunction against the Bank and a declaration that the first letter of credit was null and void. DCA also sought a temporary restraining order pending a hearing on its application for injunctive relief. On September 25 this court signed a temporary restraining order enjoining the Bank from honoring letter of credit No. G–2076 or paying the Deposit to India.

On September 28, two days before the expiration of the letter of credit, India presented a sight draft drawn on the Bank in the amount of $410,472.60 and a certificate, executed "for and on behalf of the President of India" by M. P. Cariappa, Joint Secretary to the Government of India, which contained the requisite text[4] stating that DCA had failed to carry out certain of its contractual obligations under the Agreement. The Bank, in compliance with this court's order, did not pay the draft. That same day a consent order was entered by this court which (a) allowed India to intervene as a party in interest for the purpose of preserving its alleged rights to the Deposit, (b) extended the temporary restraining order until further order, and (c) continued the hearing on DCA's application for a preliminary injunction until December 1, 1972. On November 8 India filed a petition in which it sought an order (a) dissolving the temporary restraining order, (b) directing the Bank to pay the sight draft, and (c) dismissing DCA's complaint.

As Judge Smith cogently explained in Venizelos, S.A. v. Chase Manhattan Bank, 425 F.2d 461, 464–465 (2d Cir. 1970), a letter of credit is designed to provide an assurance to the selling party of prompt payment upon presentation of documents. Ordinarily, three separate and distinct contracts are involved:

(1) The contract between a bank and its customer (usually the buyer) whereby the bank agrees to issue the letter of credit to the beneficiary (usually the seller);

(2) The contract of sale between the buyer and the seller whereby, among other things, the seller agrees to obtain payment under the letter of credit by drawing drafts thereunder and presenting them to the bank accompanied by documents specified by the buyer; and

(3) The letter of credit itself, which is a contract between the bank and the beneficiary (usually the seller) whereby the bank agrees to pay the drafts drawn under the letter of credit and presented to it by the beneficiary if they are accompanied by the requisite documents.

 Long-standing decisional law, which has been codified in the Uniform Commercial Code, establishes that the sole interest of the bank in a letter of credit transaction is in the documents to be presented, unless the parties agree otherwise. Those documents must be exactly as stated in the letter of credit and the bank is obligated to pay only if the beneficiary has strictly complied with the terms of the letter. Sisalcords Do Brazil, Ltd. v. Fiacao Brasileira De

4. See footnote 2.

Sisal, S.A., 450 F.2d 419 (5th Cir. 1971), cert. denied, 406 U.S. 919, 92 S. Ct. 1771, 32 L.Ed.2d 118 (1972); Venizelos, S.A. v. Chase Manhattan Bank, *supra.* If he has, the bank must honor his demand for payment regardless of whether the goods or the documents conform to the underlying contract of sale between the beneficiary and the bank's customer. Banco Espanol de Credito v. State Street Bank & Trust Co., 385 F.2d 230 (1st Cir. 1967), cert. denied 390 U. S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 163 (1968); Uniform Commercial Code § 5–114(1). The bank must honor a demand for payment made by innocent third parties such as a negotiating bank or a holder in due course even if the documents presented with the demand are forged or fraudulent or there is fraud in the transaction. Banco Espanol de Credito v. State Street Bank & Trust Co., 409 F.2d 711 (1st Cir. 1969); Uniform Commercial Code § 5–114(2)(a). If, however, presentment and demand is made by the beneficiary or his agent and there are no innocent third-party holders in due course involved, and prior to payment the bank is notified by its customer of fraud, forgery, or other defect not apparent on the face of the documents presented, the bank has the option of honoring or not honoring the demand, although a court of appropriate jurisdiction may enjoin honor in such a circumstance. Sztejn v. J. Henry Schroder Banking Corp., 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct. 1941); Uniform Commercial Code § 5–114(2)(b).

As may be seen, the present case is the reverse of the ordinary. Here, the seller—DCA—rather than the buyer —India—procured the letter of credit from the Bank. It did so not for the purpose of obtaining prompt payment but for the apparent purpose of providing India with additional security as to DCA's performance. Whatever, India was bound to strictly comply with the terms the letter set forth in order to activate the security device and recover the Deposit and the Bank was bound to pay the Deposit to India upon India's presentment of the requisite certificate and demand for payment.

DCA contends that injunctive relief against the Bank is warranted for two reasons. First, DCA claims that the certificate presented to the Bank by India was fraudulent. According to DCA, the Agreement obligated it to supply equipment FOB its plant, and it was India's responsibility to get the equipment from that plant to an Indian port. DCA says that, in fact, it did supply the equipment FOB its plant and, therefore, performed under the Agreement. DCA argues that India demands payment only because of the embargo imposed by the United States and not because of any failure to perform by DCA, and that although the embargo may have prevented India from shipping the equipment abroad it has not prevented DCA from performing. Since it has performed, concludes DCA, India's certification to the contrary must be fraudulent.

Second, DCA claims that the certificate did not strictly comply with the terms of letter of credit No. G–2076. According to DCA, the letter required that India's sight draft "must be accompanied by . . . *Your* signed certification . . ." (emphasis added) and the word "Your" refers to the beneficiary, "THE PRESIDENT OF IN-DIA". Thus, says DCA, the President of India himself was required to sign the certificate and since he did not the terms of the letter have not been strictly met.

India's response to the first claim is that DCA is attempting to have this court adjudicate a dispute arising out of the underlying contract of sale between DCA and India and that this court lacks jurisdiction to consider that contract. Furthermore, says India, under the Agreement any disputes arising out of the Agreement must be resolved by arbitration in New Delhi in accordance with Indian law, and even if this court had jurisdiction it would have to defer to the arbitration clause.

As for the second claim, India simply says it is ridiculous to assume that the certificate had to be signed by the President of India himself. India notes that the Constitution of the Union of India empowers the Joint Secretary to the Government to sign documents on his President's behalf and that the Joint Secretary signed other agreements on his President's behalf in dealings with DCA without objection from DCA.

The Bank has not taken sides in the dispute although it has asserted a counterclaim for interpleader.

■ The only matter properly before this court is the independent contract between plaintiff and defendant: letter of credit No. G–2076. Whether India has wrongfully refused to certify invoices submitted by plaintiff causing plaintiff to go bankrupt or whether all the provisions of the Agreement between plaintiff and India have been satisfied is not this court's concern. In this diversity case Georgia law controls and since letter of credit No. G–2076 was issued by a Georgia bank and the controversy centers about the presentment of documents to that bank for the purpose of recovering funds on deposit at that bank, the Uniform Commercial Code as adopted by the Georgia Legislature, Ga. Code Ann. §§ 109A–1–101, et seq. (1962), and as interpreted by Georgia courts, properly applies. Ga.Code Ann. § 109A–1–105 (1962). As it happens, Georgia has adopted the standard version of Uniform Commercial Code § 5–114 and, to date, that section has not been considered in any reported Georgia decisions. Accordingly, the court will look to the general law in other jurisdictions and make a hopefully educated *Erie* guess as to what a Georgia court would have done in this case.

The leading case on the subject of DCA's first claim is Sztejn v. J. Henry Schroder Banking Corp., *supra*. In that case plaintiff Sztejn brought suit to restrain defendant Schroder Banking Corporation from paying drafts under a letter of credit issued by defendant in favor of an Indian corporation named Transea.

According to Sztejn's complaint, Sztejn had contracted with Transea to purchase a quantity of bristles, and in order to secure payment Sztejn also contracted with defendant for the issuance of an irrevocable letter of credit in Transea's favor which provided that drafts by Transea would be paid by defendant upon presentment by Transea of invoices and a bill of lading showing that shipment of the bristles had been made. After the letter of credit was delivered to Transea by defendant's correspondent bank in India, Transea placed 50 cases of material on board a steamship and received from the steamship company invoices and a bill of lading describing the bristles as called for by the letter of credit. Transea then drew a draft and presented it with the invoices and bill of lading to defendant's correspondent bank. The correspondent bank forwarded the draft and documents to the defendant bank for payment. At this point, Sztejn brought suit seeking an injunction against the defendant bank and a declaration that the letter of credit was null and void on the ground, in part, that Transea had filled the 50 cases with garbage instead of bristles. Defendant's correspondent bank, which was also a named defendant in the suit, moved to dismiss this part of the complaint for failure to state a claim. Defendant's correspondent bank claimed that in a letter of credit transaction a bank's concern lies solely with the documents, not the goods, and that the documents on their face conformed to the requirements of the letter of credit.

The court denied the motion. While acknowledging the doctrine that a letter of credit is independent of the primary contract of sale and that banks are not permitted to delay paying drafts against documents proper in form, the court reasoned that the doctrine presupposes the genuineness of the documents themselves. Accepting the allegations of Sztejn's complaint as true, as it was required to do on a motion to dismiss for

failure to state a claim, the court held that the controversy was not over a breach of warranty regarding the quality of the bristles but over the very documents in which the defendant banks had a decided interest. In such a situation, said the court, the principle of the independence of the bank's obligation should not be extended to protect an unscrupulous beneficiary. The court noted also that, on the motion to dismiss, the correspondent bank had to be deemed a mere agent for collection rather than an innocent holder in due course whose claim against the issuing bank could not be defeated even if there were fraud in the transaction. The court concluded that although defendant would have been protected if it had paid against the documents presented, neither it nor its correspondent bank should really complain if before payment and in the absence of innocent holders in due course payment is enjoined on notice of fraud in the documents.

The *Sztejn* case was followed in Merchants Corp. of America v. Chase Manhattan Bank, N.A., 5 UCC Rep.Serv. 196 (N.Y.Sup.Ct. Mar. 5, 1968). There, plaintiffs, a purchasing corporation and its financing agency, procured an irrevocable letter of credit from defendant bank in favor of a foreign supplier. Under the terms of the letter the bank agreed to pay the supplier's drafts upon presentment of documents showing that the goods purchased were placed on board ships in Korea not later than January 31, 1968. Drafts aggregating some $24,000 and documents conforming on their face to the terms of the letter were subsequently presented to defendant bank. Plaintiffs were notified of this on February 19, 1968. Suspicious about the three-week interval between loading and presentment, plaintiffs went to court on February 20, 1968 and obtained a show cause order. They then conducted an investigation which revealed, they maintained, that loading took place February 13, 1968. Plaintiffs moved for a temporary injunction restraining the defendant bank from paying under the let-

ter of credit. The bank asserted that it had no knowledge to believe the documents were forged or improper and argued that it was therefore under a duty to make payment.

The court, citing *Sztejn* at length, granted plaintiffs' motion. It pointed out that the dispute was not as to warranty or breach of the underlying contract of sale but as to the terms of the letter of credit which was an independent contract between plaintiffs and defendant. Since defendant had knowledge prior to payment of plaintiffs' claim of fraud, said the court, a restraining order was warranted.

■ The court finds the reasoning of *Sztejn* compelling and believes Georgia courts would have adopted it in this case as a sound explication of Ga.Code Ann. § 109A–5–114(2)(b) (1962). Accordingly, if India's certificate is, indeed, fraudulent, DCA is entitled to the permanent injunctive relief it seeks. This, however, is an issue of fact which must be explored and resolved at trial. *See* Marine Midland Grace Trust Co. of N. Y. v. Banco Del Pais, S.A., 261 F.Supp. 884, 889–890 (S.D.N.Y.1966).

The issue of fact as to DCA's first claim will not be an easy one to resolve. The law of "fraud" is not static and the courts have, over the years, adapted it to the changing nature of commercial transactions in our society. S. E. C. v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 192–195, 84 S.Ct. 275, 11 L. Ed.2d 237 (1963). In *Capital Gains* the Supreme Court noted that in a suit for equitable relief—such as this one—it is not necessary that plaintiff establish all the elements of actionable fraud required in a suit for monetary damages, and it quoted with approval the following definitions of "fraud" in equity jurisprudence:

" 'Fraud has a broader meaning in equity [than at law] [sic] and intention to defraud or to misrepresent is not a necessary element.

" 'Fraud, indeed, in the sense of a court of equity properly includes all

acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another.' " At 193–194, 84 S.Ct. at 284.

Here, however, the court is not faced with the relatively simple problem of determining whether a seller who has certified in accordance with the terms of a letter of credit that he shipped goods to his buyer but who, in fact, shipped garbage has committed fraud so as to forfeit the rights that normally accrue to the beneficiary of a letter of credit. Instead, the court is faced with a certification of an unspecified breach of contract which involves mixed questions of law and fact and whose ultimate truth or falsity, unlike the situations in *Sztejn* and *Merchants Corp. of America,* may not be readily determined and is not the concern of the court.

Clearly plaintiff should not prevail if India has a *bona fide* legal claim of breach of contract to assert against DCA. Since, as India correctly points out, this court has no business making an ultimate adjudication regarding compliance with the provisions of the underlying sales Agreement, India will not be required to *prove* that DCA "failed to carry out certain obligations of theirs" under the Agreement in order to get payment from the Bank. Rather, the court views its task in this case as merely guaranteeing that India not be allowed to take unconscientious advantage of the situation and run off with plaintiff's money on a *pro forma* declaration which has absolutely no basis in fact. If it should turn out that there is a legal and factual basis for India's certification, the court will leave plaintiff to its remedy at law.

 The picture is less complex but no less cloudy with respect to DCA's second claim. It may very well be, as plaintiff strenuously urges, that DCA

bargained for the signature of the President of India himself on the certificate to be presented with the demand for payment. Surely the words of the letter are capable of that construction. However, if there is any ambiguity and the letter is fairly susceptible of two constructions—one which makes the letter fair, customary, and reasonable for prudent men to naturally undertake and another which makes it inequitable—the former interpretation must be preferred to the latter. Venizelos, S.A. v. Chase Manhattan Bank, *supra.* Similarly, a construction that will make the letter valid and enforceable will be preferred to one that will defeat it. *Venizelos, supra.* Since a trial will be necessary anyway on DCA's first claim, and since the parties have not briefed this issue fully, the court need not make a dispositive ruling on DCA's second claim at this time. Suffice it to say, however, that if DCA's first claim fails the court would have no reason to restrain the Bank from honoring a substituted certificate signed by the President of India himself and presented in the interim by India to the Bank.

 There remains only the question of whether plaintiff's application for a preliminary injunction ought to be granted pending the outcome of its prayer for permanent injunctive and declaratory relief. A preliminary injunction is designed to preserve the status quo, American Family Life Assurance Co. of Columbus v. Aetna Life Insurance Co., 446 F.2d 1178, 1180 (5th Cir. 1971), and the factors a court must take into consideration in weighing an application for such an injunction are the relative importance of the rights asserted, the nature of the acts to be enjoined, the relative hardships that would result if the application were granted or denied, the applicant's probability of ultimate success, and the public interest. King v. Saddleback Junior College District, 425 F.2d 426 (9th Cir. 1970).

The Deposit is currently in the hands of the Bank and is earning interest daily. It is a large sum of money and all sides attach a great deal of importance to their respective rights to it. An injunction against the Bank would merely require it to continue holding on to the Deposit. If plaintiff's application were denied, the Deposit would be on its way to India, as would plaintiff's remedy, and plaintiff, which has already filed a petition in bankruptcy, would be severely disadvantaged. India maintains an embassy in Washington, D. C. and waited nearly a year before exercising its rights under the letter of credit. It would not appear that India would be seriously disadvantaged by some further delay and the entry of a preliminary injunction. It appears to the court that plaintiff has at least a decent chance of winning this suit, and there is as much public interest in discouraging fraud as in encouraging the use of letters of credit. Accordingly, the court concludes that a preliminary injunction is warranted.

For the foregoing reasons the request of the intervenor for an order dissolving the temporary restraining order, directing defendant to pay his sight draft, and dismissing plaintiff's complaint, is denied, and plaintiff's application for a preliminary injunction against defendant is granted. Defendant, its officers, agents, servants and employees are hereby enjoined from honoring any presentation and paying any demand upon or draft made on or in connection with its letter of credit No. G–2076 dated July 28, 1971 until further order of this court. Defendant shall continue to maintain a specifically designated account in which the sum of four hundred ten thousand four hundred seventy-two and 60/100 dollars ($410,472.60), payable under its letter of credit No. G–2076 dated July 28, 1971, together with any accrued interest, shall be placed, and defendant shall continue to invest and reinvest this sum and the accrued interest in 30-day certificates of deposit at the applicable rate of interest and make no disbursements from that account except as this court may expressly direct by order or orders. The temporary restraining order heretofore entered by the court in the above-styled case shall stand dissolved.

It is so ordered.