**ROMAN CERAMICS CORPORATION,**
Plaintiff,

v.

**PEOPLES NATIONAL BANK,**
Defendant.

**Civ. A. No. 80–409.**

United States District Court,
M. D. Pennsylvania.

June 30, 1981.

Michael M. Baylson, Duane, Morris & Heckscher, Philadelphia, Pa., for plaintiff.

George E. Christianson, Lebanon, Pa., for defendant.

HERMAN, District Judge.

## I. INTRODUCTION

Plaintiff initiated this action on April 15, 1980 when it filed a complaint alleging that Defendant owes it money pursuant to an irrevocable letter of credit. Plaintiff is the Roman Ceramics Corporation (hereafter referred to as "Roman"), a Delaware corporation with principal place of business in Illinois, and Defendant is Peoples National Bank (hereafter referred to as "Peoples"), a Pennsylvania banking association with principal place of business in Pennsylvania. On May 30, 1980, Peoples filed its answer and counterclaim. Roman responded to the counterclaim by filing its reply on June 16, 1980. We held a non-jury trial on February 23–24, 1981.

## II. BACKGROUND

On February 28, 1979, Peoples opened an irrevocable letter of credit for $65,000 conditioned upon the failure of Michter's Distillery, Inc. (hereafter referred to as "Michter's") to pay the beneficiary, Roman, for certain ceramic decanters. The letter of credit required two sets of documents to be presented with any drafts drawing on the credit: 1.) Roman's invoices to Michter's and 2.) a signed statement from Roman that Michter's had not paid Roman in full for the goods described in those invoices. Credit under the letter was available only for decanters invoiced and shipped to Michter's prior to September 1, 1979.

On June 26, 1979, Michter's sold its assets to T.D. Veru, Inc. (hereafter referred to as "Veru"). Michter's changed its name to Distillery Road, Inc. and permission was granted to Veru to use the name Michter's Distillery. Peoples was assured by Veru that all obligations of Michter's incurred before July 26, 1979 would be paid by Veru.

By early October 1979, Roman had delivered to Michter's goods costing more than $278,000. Mr. Theodore D. Veru, representing Veru, and Mr. Harold Roman, representing Roman, met on October 9, 1979 to work out differences between the two companies and to arrange payment for the decanters. Also present at the meeting was Mr. John V. Bower, controller of Veru. Subsequent to the meeting, Veru wired a certain sum of money to Roman that the latter allegedly allocated among various debts of Veru. On October 19, 1979, Roman presented a draft on the letter of credit to Peoples seeking payment for five invoices: Nos. 2915 (Aug. 14, 1979), 2952, 2953, 2954, and 2956 (Aug. 20, 1979).

This action concerns the alleged failure of Michter's (through Veru) to pay Roman for the five shipments of decanters in August 1979. Based on that alleged failure, Roman drew on the letter of credit from Peoples, but Peoples refused to honor the draft. Peoples claims that it had notice that Roman had already been paid for the goods represented by the aforesaid invoices.

On August 27, 1980, we denied Roman's motion for summary judgment because we lacked certain material facts. *Roman Ceramics Corporation v. Peoples National Bank*, C.A. No. 80–409 (M.D.Pa., Aug. 27, 1980) (hereafter referred to as "*Roman I*"). In that decision we ruled on a number of important issues. First, this matter is governed by the Uniform Commercial Code of Pennsylvania, 12A P.S. §§ 1–101 *et seq.*[1] Second, the documents submitted by Roman to Peoples with the draft on the letter of credit satisfied the requirements and conditions of the letter on their face. Third, the letter of credit covered the invoices representing shipments made in August 1979, despite the acquisition of Michter's assets by Veru. Finally, we construed one of Peoples' defenses (double payment) as raising the defense of fraud pursuant to 12A P.S. § 5–114.[2] Only that possibility of fraud could permit us now, and Peoples then, to look beyond the documents presented by Roman and to examine the underlying transactions. *See Roman I, supra*, slip op. at 10–11 (and cases cited therein).

We adopted the definition of fraud under section 5–114 as espoused by the Pennsylvania Supreme Court in the nationally leading decision of *Intraworld Industries, Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316 (1975). We ruled:

> The circumstances that will justify a dishonor or an injunction against honor "must be narrowly limited to situations of fraud in which the wrongdoing of the beneficiary has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served." 461 Pa.

at 359 [336 A.2d 316]. The court analyzed a leading case on what conduct justifies an injunction against honor, *Sztejn v. J. Henry Schroder Banking Corporation*, 177 Misc. 719, 31 N.Y.S.2d 631 (1941). The New York court ruled that when the beneficiary has intentionally shipped no goods at all, the documentation was not genuine and the predicate of the independence of the issuer's engagement was removed. The Pennsylvania Supreme Court concluded that an injunction is proper only if the beneficiary has "no bona fide claim to payment under the underlying [contract]." 461 Pa. at 361, 336 A.2d 316.

*Roman I, supra*, slip op. at 12.[3] We ordered the parties to augment the record and file renewed motions if they chose.

We reviewed a second motion for summary judgment on November 25, 1980. *Roman Ceramics Corporation v. Peoples National Bank*, C.A. No. 80–409 (M.D.Pa., Nov. 25, 1980) (as amended Jan. 9, 1981) (hereafter referred to as "*Roman II*"). We found controverted material facts and ordered the parties to prepare for a hearing to resolve those contested factual issues. In *Roman II*, we analyzed a legal commentator's recent arguments supporting an alternative definition of fraud under section 5–114. Symons, *Letters of Credit: Fraud, Good Faith and the Basis for Injunctive Relief*, 54 Tulane L.Rev. 338 (1980).

Professor Symons suggests that fraud is limited to cases in which the beneficiary has intentionally misrepresented the state of affairs when he presents the draft and accompanying documents with his demand for payment under a letter of credit. *Id.* at

---

1. Although the Code has since been recodified at 13 Pa.C.S.A. §§ 1101 *et seq.*, the parties had agreed that the former version would apply. All relevant transactions and events occurred before the recodified Code went into effect.

2. Although we made such a ruling in our first order, counsel for Roman has persisted in arguing that Peoples has not pleaded fraud. *See, e.g.*, Plaintiff's Brief, p. 4 (filed Sept. 11, 1980); N.T. 192; Post-Trial Brief of Plaintiff, p. 11 n.3 (filed April 13, 1981).

3. Plaintiff argues that section 5–114 is not the appropriate standard by which to gauge the lawfulness of Peoples' dishonor of the letter of credit. Roman claims that the issue of double payment is a question of "improper presentation" under section 5–111. Post-Trial Brief of Plaintiff, pp. 22–25 (filed April 13, 1981). We believe that a beneficiary's statement that it had not been paid for goods, when in fact it had been paid, is fraud within section 5–114. If Peoples can satisfy the elements of the defense of fraud under the latter section, it can certainly advance its defense on that ground.

356, *cited in Roman II, supra,* slip op. at 4. The commentator explained the requisite elements of his suggested intentional fraud as follows:

> In general, the type of conduct that subjects one to liability for deceit consists of 1) a false representation 2) fraudulently made 3) with the intention of inducing another to rely thereon. It is to be noted that only misrepresentations that are fraudulent are included; in other words, they must contain what the law designates as scienter. It is essential to emphasize that for one's actions to be fraudulent, scienter must be present. Scienter is not a question of motive or of intention to harm, but is rather a question of intention to mislead or to deceive; it is a question of the movant's state of mind.

Symons, *supra,* 54 Tulane L.Rev. at 345.

On February 23–24, 1981, we held a nonjury trial on the two remaining controverted issues of fact. In *Roman II,* we had specified for the parties which factual matters were unresolved. We concluded that the remaining issues were "the circumstances surrounding Veru's payment to Roman (especially the time of payment question) and the Bank's notice thereof...." *Roman II, supra,* slip op. at 12. This opinion shall constitute our findings of fact and conclusions of law drawn from the testimony and exhibits adduced at the hearing, from the uncontroverted documents and affidavits filed prior to trial, and from our inferences derived from that evidence.

## III. DISCUSSION

### A. The Meeting and Agreement

On October 9, 1979, Mr. Roman, Mr. Veru, and Mr. Bower met to review the balances owed to Roman by Veru and to attempt to settle the debt. They also discussed existing and future damaged, returned decanters. (Bower, 27).[4] The meeting lasted some time between 45 minutes (N.T. 14) and two hours. (N.T. 76.)

Although the three participants agree that Mr. Bower was in and out of the meeting periodically (N.T. 14, 86; Bower 26), they differ in their accounts of the role he played. Mr. Roman insisted that he did not know who Mr. Bower was and did not conduct any of the negotiations with him. (N.T. 14, 49, 50.) Mr. Veru testified that Mr. Bower worked out the details of the subsequent agreement with Mr. Roman and that he, Mr. Veru, merely approved the final agreement. (N.T. 92.) He also repeatedly remarked that Mr. Roman and Mr. Bower worked out the numbers and accounts that were due and owing to Roman. (N.T. 86, 97, 109.) Mr. Bower referred to instances in which he spoke directly with Mr. Roman about Veru's need to shuffle its finances to pay for the decanters. (Bower 46, 47, 51.) Mr. Veru testified that the surprise nature of the meeting left him unprepared. He left it to Mr. Bower and the other accounting people to get ready for the meeting and his recollection of precise details is therefore uncertain. (N.T. 85.)

Plaintiff's counsel has seized upon a single remark of Mr. Veru, taken out of context, to claim that he and Mr. Roman were the only persons present during most of the meeting. Post-Trial Brief of Plaintiff, p.3 (filed April 13, 1981). Counsel refers to the last two lines of page 109 of the transcript as supporting his position. The full text of the relevant colloquy between Mr. Veru and Plaintiff's counsel follows:

Q. What list did John Bower have?

A. John had worked out—I said to you before—with Harold Roman, a list of things that we agreed to pay. And they paid them.

Q. Do you have personal knowledge of that?

A. I saw the list in the office, I don't remember the dates. When you asked me what was on there, but there was a list that John had and John said: Here's the money that's due up to now. And this is what I'm going to pay less certain

---

4. Mr. Bower was not present at the trial, but the parties stipulated that a transcript of his deposition could be inserted into the record. (N.T. 122.) References to Mr. Bower's testimony correspond to the pages of his deposition.

whatever credits are involved and that's it. And I said: Fine, John.

Q. That's what John Bower said to you?

A. Right.

Q. Do you have any knowledge he said that to Mr. Roman?

A. Yes, after he and Mr. Roman agreed what was to be paid.

Q. Were you present when that took place, the whole time?

A. I was in there—I think Harold and I were the only ones that were in there most of the meeting.

(N.T. 109.)

Mr. Veru's statement was not offered in response to a question about the presence of Mr. Bower. It responded to a question about Mr. *Veru's* presence during discussions and negotiations between Mr. Roman and Mr. Bower. Based upon our recollection of the cross-examination and our review of the transcript, we believe that Mr. Veru's testimony was only that he, Mr. Veru, was present, not that Mr. Bower was absent, for most of the meeting.

The issue of Mr. Bower's participation in the meeting, although collateral to the central issue of the agreement reached at that meeting, is important as validating his deposition testimony. As mentioned above, Mr. Bower testified that he conducted much of the negotiations with Mr. Roman and was therefore aware of the terms of the final agreement. We find as a matter of fact that Mr. Bower not only attended, but also participated in, much of the negotiations on behalf of Veru with Mr. Roman.

The parties agree that Mr. Roman presented a list of valid invoices indicating that Roman had shipped goods properly billed at $278,183.61 to Michter's. (N.T. 13; Bower 16.) They also agree that on the date of the meeting invoices totalling $220,199.61 were due and owing to Roman. (N.T. 13; Bower 27.) This sum represented the total of all invoices dated on or before September 11, 1979. (N.T. 44–45.) The parties agreed that Mr. Roman offered a credit of $3,117 to Veru to alleviate the high cost of the financing upon which Veru was forced to draw. (N.T. 13, 79, 91.) A sum of $217,082.61 was therefore due and owing to Roman by Veru. (N.T. 14, 44–45; Bower 27.) Payment of that amount was to be wired to Roman's bank because use of the wire ensured the fastest transfer of funds. (N.T. 18–19, 115–16.)

The principal point of contention is Mr. Roman's claim that he had conditioned the credit on transfer of the wire payment *on the day of the meeting, October 9, 1979.* (N.T. 13.) Upon realizing that the banks were closed, however, Mr. Roman changed the date. He testified:

I said: Well, provided you wire transfer the funds tomorrow, the 10th [of October, 1979], directly to the account of Roman Ceramics at the American National Bank in Chicago, I will allow this discount and I will accept $217,082.61 in full payment of all invoices up to and including September 11, 1979.

(N.T. 14.) Mr. Roman concluded by saying that Mr. Veru accepted this.

Roman argues that its claim that payment on October 10, 1979 was a condition for the availability of the credit was corroborated by phone calls made by Mr. Roman on October 11, 1979. Roman, however, refers to only one of the calls Mr. Roman made that day. That call was to Mr. Philip S. Davis, Esquire, a guarantor of Michter's account with Roman. Mr. Roman said Veru had not paid for certain invoices and Mr. Davis replied that if Veru did not pay, he and another guarantor would. (N.T. 15–16.) We do not agree that this exchange corroborates Mr. Roman's contention that the wire was due on a specific date.

Two days after the meeting, Mr. Roman may well have wanted to encourage Veru to wire the payment as soon as possible by calling Mr. Davis and thus applying pressure. We realize this is speculative, but any intimation about the call reflecting an agreement for a specific date of payment is also speculative. Nowhere in his testimony did Mr. Roman aver or imply that he told Mr. Davis about the condition. There was nothing, therefore, for Mr. Davis to rebut

when he testified. Mr. Roman told him that he had met with Mr. Veru and had arranged for a wire transfer that Mr. Roman said was to be effected the preceding day. The position of Peoples, through the Veru witnesses, is that payment was to have been made *promptly*. Those positions are not contradictory without specific reference to the separate matter of making time of payment a condition.

Another telephone call involving Mr. Roman was initiated by Veru's attorney, Mr. Theodore Prounis, on that same afternoon, October 11, 1979. Mr. Roman told Mr. Prounis that Roman's bank had not received the wire transfer that had been agreed upon. Mr. Prounis replied that the money was on its way and that Roman would get it. (N.T. 17–18.) Again, no word came from Mr. Roman that the credit had lapsed because the payment had not been made on October 10, 1979.

Mr. Veru and Mr. Bower disagree with Mr. Roman's claim of a condition attached to the credit.[5] Mr. Veru testified that Mr. Roman naturally wanted the money as soon as possible because he was a businessman. (N.T. 79, 84, 88–89.) The credit was to allow Veru to draw on its financing to pay Roman as promptly as possible. (N.T. 93–94.) Mr. Roman had a choice, according to Mr. Veru, either to wait until Veru could pay Roman out of its cash flow[6] or to provide the credit to allow Veru to draw on its financing. (N.T. 94.) Mr. Veru swore that no agreement had been made requiring Veru to pay by a certain date; the agreement was only that Veru should pay promptly. (N.T. 96–97, 105–06.)

Mr. Bower testified that Mr. Roman wanted payment promptly and that he, Mr. Bower, had estimated a day, October 11, 1979, on which he believed that Veru could pay. (Bower 18–21.) Mr. Bower also acknowledged Mr. Roman's desire for immediate payment. (N.T. 29–30.) But Mr. Bower absolutely denies that the credit was dependent upon payment being made the day after the meeting. (Bower 30.) The discount hinged only on prompt payment by Veru, but prompt payment was not necessarily that day or the next day. Payment was to be made within a reasonable time, but as soon as possible. (Bower 31–33, 50–51, 60.)

We believe, and find as a critical matter of fact, that Mr. Roman had expressed his desire for immediate payment, but that he had *not* made immediate payment or payment on some specific date a condition for the availability of the discount of $3,117. Nor could Mr. Roman have reasonably believed that such a condition had been imposed upon Veru.[7] Our belief is based largely on the underlying consistency of Veru's position as opposed to the continually shifting positions of Roman.

Mr. Roman knew that the financial arrangements of Veru would require some time for Veru to wire the money to Roman. (N.T. 13–14.) Yet, Mr. Roman also denied any knowledge about the need for substantial movement of cash. (N.T. 50.) Mr. Veru and Mr. Bower agreed that Mr. Roman was present while they discussed the

---

**5.** Plaintiff's counsel claims to have found "many" discrepancies between the testimony of Mr. Bower and that of Mr. Veru. Post-Trial Brief of Plaintiff, p. 9 (filed April 13, 1981). One of the three noted "discrepancies" is between Mr. Bower and a document produced during his deposition. *See* note 12 and accompanying text, *infra*. The other two "discrepancies" are statements of Mr. Bower that Mr. Veru did not make or did not recall. In the latter instance, Mr. Bower agreed with Mr. Roman about the term "anticipation credit," but Mr. Veru recalled no such term. Although Plaintiff's counsel also refers to "several other discrepancies" in the testimony, he chose not to provide us with references to either the sub-

ject matter or the page in the transcript. We conclude that any discrepancies were de minimis and do not reflect on the credibility of the witnesses.

**6.** Mr. Veru blamed Roman for the poor cash flow because the latter had been allegedly late in delivering the decanters. (N.T. 94.)

**7.** Much of Roman's argument is based upon a finding that the condition existed or that Mr. Roman could reasonably have believed it to exist. Post-Trial Brief of Plaintiff, pp. 2, 4–8, 15–19 (filed April 13, 1981). Without time of payment as a condition, much of Roman's argument falls.

need to arrange financing against their inventory and receivables (N.T. 78, 85, 90–91; Bower 21, 46–47) and to redeem some Treasury bonds. (Bower 30, 46.) We believe that Mr. Roman was aware of the need of Veru to arrange for the payment of an amount over $217,000.00, without necessarily knowing the specific details. (Bower 46–47.) It follows that Mr. Roman could not reasonably have demanded, nor could Mr. Veru or Mr. Bower reasonably have agreed, that Veru would wire the money on October 10, 1979 with only one evening's notice.

According to Mr. Roman's account of the meeting and agreement, he had specified October 10, 1979 as the required date of the wire for Veru to qualify for the discount on payment for all invoices dated on or before September 11, 1979. (N.T. 13–14.) In cross-examination, however, defense counsel brought out two civil actions related to this case.[8] In these cases, Mr. Roman reviewed and approved pleadings that are wholly at odds with the allegations advanced by Roman in the case now before us. (N.T. 58–61; DX–1; DX–2.) Paragraphs six and seven of Roman's complaint filed against Distillery Road, Inc. aver the following:

6. On or about September 19, 1979, plaintiff sold and delivered to defendant, Michter's, goods which were ordered by defendant, Michter's.

7. The price of the goods which were sold and delivered to defendant Michter's, was $31,104 discounted by $3,117 for payment on or before October 20, 1979, which was the fair and reasonable price for such goods and the price which defendant, Michter's, agreed to pay. [The invoices attached and incorporated are Nos. 3074 and 3075.]

(DX–2.) Paragraph four of Roman's answer and counterclaim in the action brought by Veru is similar. (DX–1.)

Roman is clearly alleging two facts in those related actions that are refuted by Mr. Roman's testimony in the action now before us. First, Roman claims that the discount applied to certain invoices dated *after* September 11, 1979. Second, Roman claims that the discount would have been good until October 20, 1979.

On redirect examination, Mr. Roman testified that he did not know why the date October 20, 1979 appeared in the other two actions.[9] He swore that said date was an error because the real date was October 10, 1979. (N.T. 61–63.)[10] Mr. Roman and his counsel failed to address the issue of the invoices to which the discount applied, i. e., pre-September 11, 1979 invoices or post-September 11, 1979 invoices. This error in the pleadings of the related actions is not the only contradiction in positions asserted by Roman. We have found other inconsistencies in its presentation.

In his examination of Mr. Bower, counsel for Roman attempted to establish that Mr. Roman had conditioned the discount on payment made on or before *October 11, 1979.* (Bower 18–21, 32–33.) We cannot say that Roman would have seized upon such an admission by Mr. Bower that payment was due on October 11, 1979 and would have altered its claim accordingly. We can note, however, the efforts of Roman to prove that a date other than October 10, 1979 was the date of payment. We believe that even if Mr. Bower had testified that payment

---

**8.** The other two actions are *T. D. Veru, Inc. v. Roman Ceramics Corporation,* C.A. No. 80–26 (M.D.Pa.) (answer and counterclaim of Roman filed Feb. 19, 1980) (DX–1), and *Roman Ceramics Corporation v. Distillery Road, Inc.,* C.A. No. 79–1583 (M.D.Pa.) (complaint of Roman filed Dec. 28, 1979) (DX–2).

**9.** This date is roughly 30 days after the September 19, 1979 invoices and leads to the conclusion that Roman did not regard invoices as due and owing until 30 days after shipment as indicated by the invoice date. *See* notes 16 & 17 and accompanying text, *infra.*

**10.** We note that counsel for Roman in this case also represents Roman in the related actions and should also have been aware of the contradictory positions. Moreover, Roman has yet to amend either of the related pleadings to reflect its present awareness of the alleged error. The two related actions are now consolidated under the caption and docket of C.A. No. 79–1583.

was due on October 11, 1976 [11] that would show at least that Mr. Roman's certain recollection that he had demanded payment by October 10, 1979 was suspect.

One of the most important matters affecting the credibility of Roman's position about the meeting and Mr. Roman's intentions concerns the wire transfer of funds and Mr. Roman's actions thereafter. We believe that the circumstances surrounding that transaction are fundamental to resolution of Mr. Roman's credibility and scienter in this case and we will examine them separately.

*B. "Allocation" of the Wire Payment*

To explain another blatant contradiction concerning the meeting and the agreement reached, Mr. Roman was questioned about a letter he wrote to Veru dated October 18, 1979. In that letter, Mr. Roman states:

> As per our agreement, we are applying your wire transfer, in the amount of $217,082.61, per the attached Schedule A.

(PX–10.) In Schedule A, Mr. Roman claims that the wire of money from Veru to Roman paid for five invoices dated *after* September 11, 1979 [12] and one item called a pro forma invoice dated October 8, 1979. In *Roman II*, we had ruled as a matter of law that Roman's alleged allocation of the wire transfer was unlawful and that the payment of the $217,082.61 was payment in full

for all invoices dated before September 11, 1979. *Roman II, supra,* slip op. at 9–11. Nevertheless, we will review the wire by Veru, its receipt by Roman, and the latter's disposition of the payment to help establish the intent and state of mind of Mr. Roman in his decisions affecting this case.

On Monday, October 15, 1979, Veru wired to Roman's account at American National Bank the sum of $217,082.61. (N.T. 18; Bower 15.) Mr. Roman noted that the wire contained no instructions or list of invoices or explanation of the remittance. (N.T. 20.) Mr. Roman testified that he then called Roman's counsel and told him what had transpired. (N.T. 20–21.) Mr. Roman claims that he asked counsel if he could allocate the money received in any way he chose, specifically intending to leave open certain invoices dated prior to September 1, 1979. He wanted to draw on the letter of credit for the omitted pre-September 1, 1979 invoices. (N.T. 21.)

Allegedly on the advice of his counsel,[13] Mr. Roman instructed his bookkeeper to apply the wire payment to all invoices other than the five previously noted pre-September invoices. For those latter invoices, Mr. Roman told her to draw on the letter of credit from Peoples. (N.T. 22.) Roman produced an internal document that supported this position. (PX–7.) On October 18, 1979, Mr. Roman wrote the letter to

11. Mr. Bower may well have meant October 12, 1979 because he indicated his belief that Veru could arrange the payment by the *Friday* after the meeting, which date he believed to be October 11, 1979. That Friday was actually October 12, 1979.

Mr. Bower explained that his notation, "To be paid on 10/11 less 1.4167%" (PX–2), represented his estimate of the date on which Veru could wire the $217,082.61 to Roman. (Bower 21–22, 32–33.) It did not represent, he asserted, any agreement between the parties for Veru to pay by a certain date to qualify for the discount of $3,117.

12. The invoices dated after September 11, 1979 to which Mr. Roman allegedly applied the wire payment were Numbers 3074 and 3075 (Sept. 19, 1979) and 3134, 3135, and 3177 (Oct. 8, 1979).

13. Counsel for Peoples had objected to Mr. Roman testifying about what he told counsel

and what counsel told him. We overruled the objection and permitted Mr. Roman to continue. If counsel for Peoples had intended to raise some attorney-client matter, Mr. Roman as the client could waive it and relate his confidential conversations. Also, what counsel told Mr. Roman was not hearsay because it was not offered to prove the truth of the matter asserted. Fed.R.Evid., Rule 801(c). Mr. Roman was explaining only why he acted as he did. Nevertheless, Roman's trial counsel changed his question to avoid mentioning what Roman's corporate counsel had said. We have nothing in the evidence, therefore, directly relating to the advice that Mr. Roman supposedly received from his counsel. Moreover, Mr. Roman's brief description of the facts he presented to Roman's counsel (N.T. 21) is insufficient and far too generalized to have enabled his counsel to render competent advice.

Veru, explaining his application of the funds to all invoices except the five that pre-dated September 1, 1979. (PX–10.) This was three days after receiving the wire and one day after dispatching the draft on the letter of credit. (PX–8.)

Mr. Roman testified that the opening phrase of the October 18, 1979 letter (PX–10) to Veru, "As per our agreement . . ." refers to the only agreement he had with Mr. Veru, the one arising from the meeting held on October 9, 1979. (N.T. 28.) Mr. Roman otherwise claimed, however, that the agreement reached on that date was for payment of all invoices dated *on or before* September 11, 1979. (N.T. 14, 44–45; PX–4.) *See also* Affid. of H. Roman, ¶ 4 (filed Sept. 11, 1980; Affid. of T. D. Veru, ¶ 3 (filed Sept. 22, 1980); and Post-Trial Brief of Plaintiff, p.2 (filed April 13, 1981).

The contradiction is obvious. On one hand, Mr. Roman swears that the agreement reached at the meeting was for Veru to pay only for all invoices dated on or before September 11, 1979. This position is echoed by all parties in this proceeding and is supported by the available documents. (PX–2; PX–4.) We are firmly convinced that this was the agreement. On the other hand, Mr. Roman dispatched the October 18, 1979 letter in which he claimed that the agreement reached at the meeting was to pay for most, but not all, of the pre-September 11, 1979, for all five invoices dated after September 11, 1979, and for some item of Mr. Roman's creation, a pro forma invoice.

When questioned about Veru's receipt of the October 18, 1979 letter and whether it led to any discussions, Mr. Bower responded:

A. Yes, we immediately recognized it was absolutely not what we agreed to.

Q. And—

A. We thought it rather comical that Mr. Roman would find us paying invoices that had yet to even be billed, "pro formas," while at the same time leaving open invoices that are more than 30 days old. It is ridiculous on its face.

(Bower 38–39.) We agree with Mr. Bower's assessment of the alleged allocation.

Mr. Roman was initially sure and then unsure whether the pro forma invoice had ever been sent to Veru. (N.T. 51–52.) The pro forma invoice was purely a fiction created by Mr. Roman to balance his books against the wire payment of $217,082.61 sent by Veru. (N.T. 52–53.) Mr. Roman had "allocated" the wire payment to some alleged debt that he had back-dated. It did not exist at the time that the payment was made. Mr. Roman claimed that the pro forma invoice sought payment for some of the replacement decanters shipped to Michter's to replace others that had broken. (N.T. 53–56.)

We previously ruled that the alleged allocation of the wire payment was improper because Veru had manifested its intention that the payment should be applied to all invoices dated on or before September 11, 1979. *Roman II, supra*, slip op. at 9–11; *First National Bank In Palm Beach v. United States*, 591 F.2d 1143, 1147 (5th Cir. 1979); Restatement of the Law, *Contracts*, § 387(a) and comm. e.[14] Moreover, Roman applied the wire to debts that were not due on the date of the wire. Contrary to the "factual" argument of his counsel,[15] Mr. Roman testified that Roman did not consider a debt due until 30 days after the invoice date. (N.T. 43.)[16] The five invoices dated after September 11, 1979 may have

---

14. Our previous ruling on the allocation was necessary because we had not determined at that time that the wire payment had been made in full compliance with the agreement reached at the meeting. With that fact now established, there could be no allocation to some other debts. Mr. Roman's attempted allocation is being examined solely to reveal his state of mind.

15. Post-Trial Brief of Plaintiff, p. 20 n.6 (filed April 13, 1981).

16. In a letter dispatched to Veru on October 24, 1979, Roman noted that it regarded only the invoices dated September 19, 1979 as due and owing at that time. (PX–12.) Not until November 19, 1979 did Roman regard the invoices dated October 8, 1979 as due and owing. (PX–13.)

been fixed and certain debts, but the time for their payment had not yet arrived. *See* Black's Law Dictionary 448 (5th ed. 1979). *See also Purdy v. Purdy Estate*, 429 Pa. 80, 82–84, 239 A.2d 375 (1968). Even if the wire were not in accordance with the agreement or if Veru had manifested no intention to apply the payment to only pre-September 11, 1979 invoices, Roman could not apply the money to the September 19, 1979 or October 8, 1979 invoices because they were not due.[17] *See* 60 Am.Jur.2d *Payment* § 97 (1972). For all of these reasons, we reassert our holding that the alleged allocation of the wire payment was improper.

### C. Fraud Under Section 5–114

We previously noted that the standard against which we must measure Roman's conduct, actions, and manifested intent was set out in *Roman I* as a " 'wrongdoing of the beneficiary [that] has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served.' " *Roman I, supra,* slip op. at 12, *citing Intraworld Industries, Inc. v. Girard Trust Bank, supra,* 461 Pa. 343, 359, 336 A.2d 316 (1975).

Another test, suggested by a legal commentator, limits fraud to cases in which a beneficiary intentionally misrepresented the state of affairs when he presented drafts and accompanying documents with his demand for payment under a letter of credit. *Roman II,* slip op. at 4, *citing* Symons, 54 Tulane L.Rev. 338, 356, *supra.* This latter test, however has not been adopted by Pennsylvania courts, whose jurisprudential lead we are constrained to follow in this diversity action. Nevertheless, if some conduct fits within the so-called egregious fraud standard of *Intraworld,* it must certainly satisfy the less strict Symons standard of intentional fraud.[18]

17. *See also* note 10, *supra.*

18. We do not suggest, as Roman's counsel attributes to us, that the *Intraworld* standard is the same as the Symons standard. Post-Trial

### 1. *Summary of the Facts*

We will apply those tests to the following factual scenario drawn from the testimony, exhibits, and reasonable inferences therefrom. The critical span of time extends from the meeting on October 9, 1979 through Peoples' dishonor of the draft on October 22, 1979. Some matters subsequent to that time will also be reviewed as reflecting on the credibility of witnesses.

Mr. Roman became concerned when Michter's failed to pay for certain invoices of Roman by the thirtieth day after billing. (N.T. 8–9.) He therefore travelled unannounced to the premises of Veru to arrange for payment of the past-due invoices. (N.T. 9–10.) Roman was engaged in other litigation with another company run by Mr. Veru and Mr. Roman did not feel confident about dealing with Mr. Veru. (N.T. 11.) Mr. Roman was clearly worried about being paid for decanters his company had shipped to Michter's.

At the meeting, held on October 9, 1979, Messrs. Roman, Veru, and Bower agreed that Veru would pay for all invoices to Michter's dated on or before September 11, 1979 less a discount of $3,117. Mr. Roman expressed his desire to be paid immediately, but the agreement between the parties Roman and Veru was only that payment would be made promptly. Payment by a specific date was not a condition to the availability of the discount. The discount was offered by Mr. Roman to offset the costs that Veru would experience in drawing on its financing arrangements. Mr. Roman could have waited for Veru to pay for the decanters out of its cash flow. But to receive payment as soon as possible, Mr. Roman agreed to give the discount to alleviate the financing burden on Veru.

Another major topic of discussion was Veru's allegation that many of the Roman decanters had been returned as defective and leaking. Veru wanted replacements.

Brief of Plaintiff, p. 14 n.5 (filed April 13, 1981). Fraud that satisfies the *Intraworld* standard must satisfy the Symons standard. But the reverse is not true.

By Thursday, October 11, 1979, Mr. Roman had grown concerned about the payment by Veru and moved to pressure Veru into fulfilling the agreement. Mr. Roman called Mr. Davis, a guarantor of Veru's account with Roman, and expressed his concern that payment had not been made. Mr. Davis assured Mr. Roman that either Veru or he and another guarantor would pay for the goods. Mr. Roman then called Mr. Prounis, counsel for Veru, and again expressed his concern. Mr. Prounis also sought to assuage Mr. Roman by explaining that the payment was on its way.

From Wednesday, October 10, 1979 through Friday, October 12, 1979, Mr. Bower had arranged the financing and sale of Treasury bonds to allow Veru to wire the amount agreed upon.

On Monday, October 15, 1979, Veru wired the payment to Roman's bank in accordance with the agreement reached at the meeting. When Mr. Roman received notice that his bank had received the wire, he devised a scheme to arrange payment for all decanters Roman had shipped to Michter's. After allegedly discussing his strategy with his counsel,[19] Mr. Roman dispatched two sets of papers.

The first set of documents, sent to Peoples, was the draft on the letter of credit. (PX–8.) The second set, mailed to Veru, was an alleged allocation of the wire payment. Mr. Roman sent the first set in reliance on the validity of the second set. We believe that Mr. Roman's reliance was misplaced and that his intentional maneuverings of paper accounts was done with full awareness of its impropriety.

Mr. Roman's letter to Veru, dated October 18, 1979, is the first in a series of changes of position of Mr. Roman. The letter does not claim to be an allocation of a general payment to certain invoices of Roman's choosing, including all invoices dated after September 11, 1979. The letter expressly indicates that the application of the wire payment was based on the agreement reached at the meeting. Mr. Roman was clearly attempting to alter the terms agreed upon at the meeting to suit his purposes. Mr. Roman knew what the agreement had been: All invoices dated prior to September 11, 1979, less a discount, would be paid by a wire to Roman's bank of $217,082.61.

The proper amount ($217,082.61) had been sent in the proper way (by wire transfer) to the proper place (American National Bank) within the proper time (promptly, i. e., on the fourth business day). Mr. Roman, however, intentionally misapplied the payment to all five post-September 11, 1979 invoices and the fictional pro forma invoice. He knew that Veru had satisfied its agreement with Roman and had paid for all pre-September 11, 1979 invoices, but he juggled Roman's record and the payment to show that five of those invoices remained unpaid. Having done so, he attempted to be paid twice for those invoices by drawing on the letter of credit.

Mr. Roman may have believed that Veru would be tardy in paying for the post-September 11, 1979 invoices. He may have believed that Veru would absolutely refuse to pay them. That does not, however, make it "good business practice and entirely reasonable" to shuffle papers, payments, and accounts to force Peoples to pay for invoices that had already been paid. See Post-Trial Brief of Plaintiff, p. 20 (filed April 13, 1981.) Roman wants to be paid twice for five pre-September invoices to cover the present failure of Veru to pay for the post-September 11, 1979 invoices.

On October 22, 1979, Peoples dishonored the draft on the letter of credit. The dishonor precipitated the second change of position by Roman. On October 24, 1979, Roman dispatched a letter to Veru that appears to confirm Veru's claim that all invoices dated through September 11, 1979 had been paid by the wire transfer. (PX–12.) That letter stated:

> In view of your advice to the Peoples National Bank of Lebanon that you have paid all bills through September 11th, there is now due the following:

---

**19.** See note 14, supra.

| DATE | INVOICE NO. | AMOUNT |
|------|-------------|--------|
| 9/19/79 | #3074 | $12,672 |
| 9/19/79 | #3075 | 18,432 |
| | | $31,104 |

(PX–12.) It certainly appears, and Peoples could reasonably believe, that Roman had accepted the position of Veru and Peoples about the application of the wire payment. (See DX–5.) A similar letter was sent by Roman's counsel to Veru on November 19, 1979. (PX–13A.)

On December 28, 1979, Roman changed its position again by indicating in a complaint filed against Distillery Road, Inc. that the discount of $3,117 would have applied to the invoices dated September 11, 1979 if Veru had paid them on or before October 20, 1979. (DX–2.) Roman repeated that position in a counterclaim filed in another civil action on February 19, 1980. (DX–1.) [20]

Roman changed its position again by adopting its present stance that the agreement reached at the meeting on October 9, 1979 was for the payment of all invoices dated on or before September 11, 1979. The discount applied to the payment of those invoices, not the invoices dated September 19, 1979.

### 2. Application of the INTRAWORLD-Symons Tests

We conclude that Roman's efforts to have Veru and Peoples both pay for the same invoices is a wrongdoing that so vitiates the entire transaction that the legitimate purposes of the independence of Roman's letter of credit with Peoples are no longer served. See *Intraworld Industries, Inc. v. Girard Trust Bank, supra*, 461 Pa. 343, 359, 336 A.2d 316 (1975). *See also Roman I, supra*, slip op. at 11–13. Roman's position of seeking payment for invoices that had already been paid is no different from the situation faced by the New York court in *Sztejn v. J. Henry Schroder Banking Corporation, supra*, 177 Misc. 719, 31 N.Y.S.2d 631 (1941). That court found fraud under section 5–114.

Roman clearly had no bona fide claim to payment remaining under the underlying sale to Veru and therefore cannot force Peoples to honor the letter of credit. Roman is acting as an unscrupulous beneficiary who seeks to take advantage of the traditional independence of Peoples' obligations under the letter of credit. *West Virginia Housing Development Fund v. Sroka*, 415 F.Supp. 1107, 1114 (W.D.Pa.1976), *citing Dynamics Corporation of America v. Citizens & Southern National Bank*, 356 F.Supp. 991, 998 (N.D.Ga.1973). Thus, under the *Intraworld* egregious fraud standard, Roman's knowing conduct prevents it from claiming under the letter of credit from Peoples.

As we mentioned earlier, conduct that violates the *Intraworld* standard must also violate the Symons standard. The three elements advanced by Professor Symons have clearly been satisfied. Roman's claim that it had not been paid for the five August 1979 invoices was a false representation. Roman, through Mr. Roman, knew full well that Veru's wire payment was intended to pay and did in fact pay for all invoices dated on or before September 11, 1979, but Roman misapplied the payment intending to mislead and deceive Peoples to induce the Bank to pay for invoices that had already been paid.

Although we conclude as a matter of law that Roman's conduct constituted fraud under section 5–114, notice of the alleged fraud to Peoples at the time of dishonor is essential for Peoples to have lawfully dishonored Roman's draft. *Dynamics Corporation of America v. Citizens & Southern National Bank, supra*, 356 F.Supp. 991, 996 (N.D.Ga.1973); *West Virginia Housing Development Fund v. Sroka, supra*, 415 F.Supp. 1107, 1114 (W.D.Pa.1976).

### D. Notice of Peoples

Mr. G. Harold Bucher is the senior vice president and secretary for Peoples and has been employed with that bank for approximately ten years. He was the person who issued the letter of credit to Roman on

---

**20.** *See* notes 9–11 and accompanying text, *supra*.

Peoples' behalf. (N.T. 124.) He also directed the dishonor of Roman's draft on October 22, 1979. (N.T. 129–30; PX–9.)

In the week or so before Peoples received the draft from Roman, Mr. Davis had contacted Mr. Bucher and told him that Roman might submit a draft on the letter of credit. (N.T. 171.) Mr. Davis had asked Mr. Bucher not to honor the draft until he had an opportunity to inspect it and determine its validity. (N.T. 172.) Mr. Davis told Mr. Bucher that all invoices dated before September 1, 1979 had been paid by Veru and that Peoples' obligation under the letter of credit had therefore been terminated. (N.T. 144–45, 170–71, 173.)

Mr. Bucher also spoke with Mr. Bower about Roman's draft and learned that the invoices presented by Roman had been paid by Veru. (N.T. 127–28; Bower 41, 50.) Mr. Bower followed his telephone conversation with Mr. Bucher by sending a letter documenting his claim that Veru had paid Roman for the invoices. (Bower 41; DX–4.)[21]

Plaintiff's counsel spent a good bit of cross-examination on the question of Mr. Bucher's discussions with others at Peoples before dishonoring the draft. (N.T. 134–42.) Roman does not dispute that Mr. Bucher was the officer of Peoples in whom responsibility for the letter of credit was vested. Accordingly, his efforts or failure to consult others at Peoples before dishonoring is irrelevant. He had notice of the machinations of Roman and that is sufficient notice to Peoples to justify the dishonor.

Counsel for Roman confuses the standards by which we must accept evidence under the Federal Rules and those used by Peoples. Roman claims that the notice to Mr. Bucher was defective because it was hearsay and of low weight. We will impose no such standard on an issuer. Although an issuer takes a chance when it relies upon non-documented statements of the customer against those of the beneficiary, it is certainly entitled to do so.

The safe course may have been for Peoples to demand that Veru bring an injunctive action against it under section 5–114(2)(b). But that course was not required. The Code specifies that when an issuer is notified of possible fraud,

an issuer acting in good faith *may* honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents . . . .

12A P.S. § 5–114(2)(b) (emphasis added). Clearly an issuer, upon notification of fraud, may refuse to honor. *Id.* comm. 2. Furthermore, the Code imposes no particular burden of proof on an issuer before that issuer may dishonor on some notice of fraud. Similarly, the business practices adopted by other issuers are not relevant in establishing the conduct that Peoples should have followed under section 5–114.[22]

We hold that Peoples, through Mr. Bucher, had notice of the fraud attempted by Roman before it dishonored the draft the latter presented.

## IV. CONCLUSION

The agreement reached at the meeting held between Messrs. Roman, Veru, and Bower on October 9, 1979 was for Veru to pay $217,082.61 to Roman as promptly as possible. The discount of $3,117 did not hinge on payment by any specific date, but was given by Roman to allow Veru to draw on its financing agreements. The payment was to be wired to Roman's bank and covered all invoices of Roman to Michter's dated on or before September 11, 1979.

When Roman received the wire on October 15, 1979, Mr. Roman intentionally and

---

21. The letter is not notice to Mr. Bucher because he did not receive it until after he had dishonored Roman's draft on the letter of credit. Mr. Bower's letter, however, does go toward establishing and confirming the content of the telephone conversation between the two men.

22. This is the rationale behind our exclusion of Roman's banking expert from testifying. (N.T. 63–67.)

knowingly misapplied it to invoices that were neither in the agreement nor due and owing. Mr. Roman did that to try to draw on the letter of credit from Peoples. Mr. Roman knew that his action was improper because he knew that Veru had paid for the invoices he presented to Peoples as unpaid. Roman's attempt to receive double payment for the five August 1979 invoices, therefore, constituted fraud under section 5–114.

Mr. Bucher, the officer of Peoples responsible for the letter of credit, had notice of the fraud of Roman when he dishonored the draft submitted by Roman on the letter of credit. With that notice of fraud, Peoples acted lawfully when it dishonored Roman's draft.

We will order the Clerk to enter judgment against Plaintiff Roman Ceramics Corporation and in favor of Defendant Peoples National Bank.